217 P.3d 310 (2009)
STATE of Washington, Respondent,
v.
Tony L. STRODE, Petitioner.
No. 80849-0.
Supreme Court of Washington, En Banc.
Argued June 10, 2008.
Decided October 8, 2009.
*312 David N. Gasch, Gasch Law Office, Spokane, WA, for Petitioner.
Michael George Sandona, Ferry County Prosecutor's Office, Republic, WA, for Respondent.
Jeffrey Erwin Ellis, Ellis Holmes & Witchley PLLC, Suzanne Lee Elliott, Attorney at Law, Seattle, WA, Amicus Curiae on behalf of Washington Association of Criminal Defense Lawyers.
James Morrissey Whisman, King County Prosecutor's Office, Seattle, WA, Amicus Curiae on behalf of Washington Association of Prosecuting Attorneys
ALEXANDER, C.J.
¶ 1 We have plainly articulated the guidelines that every trial court must follow before it closes a courtroom to the public. State v. Bone-Club, 128 Wash.2d 254, 258-59, 906 P.2d 325 (1995). In the Bone-Club case, we held that a courtroom may be closed to the public only when the criteria for closure identified in that case are satisfied. Here, the trial court violated Tony Strode's right to a public trial by conducting a portion of jury selection in the trial judge's chambers in unexceptional circumstances without first performing the required Bone-Club analysis. This is a structural error that cannot be considered harmless. Therefore, reversal of Strode's conviction and remand for a new trial is required.

I
¶ 2 Tony L. Strode was charged in Ferry County with first degree rape of a child, first degree attempted rape of a child, and first degree child molestation. A jury trial on the charges commenced on July 10, 2006. Because the case against Strode centered on allegations that Strode had sexual contact with a child, prospective jurors were given a confidential juror questionnaire to complete. In it they were asked whether they, or anyone close to them, had either been the victim of sexual abuse or accused of committing a sexual offense. Those who answered "yes" to either question were called one at a time into the judge's chambers for questioning on the issue of whether their past experiences would preclude them from rendering a fair and impartial verdict in the case. The trial court conducted this form of individual voir dire for at least 11 prospective jurors.[1] Counsel for the State and Strode have both *313 acknowledged in their briefing that the record is devoid of any indication that the trial judge held a Bone-Club hearing prior to these interviews being conducted in chambers.
¶ 3 The only persons present during the individual questioning of the 11 prospective jurors were the trial judge, prosecuting attorney, defense counsel, and the defendant. In questioning some of these prospective jurors, the judge alluded to the fact that the questioning was being done in chambers for "obvious" reasons, to ensure confidentiality, or so that the inquiry would not be "broadcast" in front of the whole jury panel. Verbatim Report of Proceedings (VRP) (July 10, 2006) at 5, 10, 12, 20, 26, 34, 37. During this process, the trial judge and counsel for both parties asked questions of the potential jurors about their backgrounds, based on their answers to the questionnaire. Challenges for cause were registered in chambers and either granted or denied following the examination of each of these prospective jurors. As a result of this interview process, 6 of the 11 prospective jurors were excused for cause. The remainder were returned to the jury pool for the continuation of jury selection in open court. The trial judge then called the entire remaining jury pool into the courtroom, administered an oath to the jury, and voir dire continued.
¶ 4 At the conclusion of the trial, the jury convicted Strode of all of the charges against him. Strode appealed his convictions to the Court of Appeals, Division Three. That court transferred the appeal to the Washington Supreme Court, and we accepted review.

II
¶ 5 Whether a defendant's constitutional right to a public trial has been violated is a question of law, subject to a de novo review on direct appeal. State v. Brightman, 155 Wash.2d 506, 514, 122 P.3d 150 (2005).

III
¶ 6 Strode contends that the interviewing of potential jurors in the trial judge's chambers violated his constitutional right to a public trial as guaranteed by the state and federal constitutions. The State responds that the trial was not closed to the public because "[t]he interviews took place prior to the commencement of the trial." Resp't's Br. at 6. The State also submits that even though the trial court did not engage in a Bone-Club analysis before closing a portion of the trial to the public, the rationale for the courtroom closure can be found in the record. In addition, the State contends that because Strode and his attorney were present during this individual questioning, Strode waived his right to argue that his right to a public trial had been violated. Finally, the State maintains that even if the interviews of prospective jurors in chambers is deemed an unjustified closure of a public trial, the violation was insignificant and did not infringe on Strode's constitutional right to a public trial.
¶ 7 The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... public trial." Article I, section 22 of the Washington Constitution similarly guarantees that "i[n] criminal prosecutions the accused shall have the right ... to have a ... public trial." The Washington Constitution also provides in article I, section 10 that "[j]ustice in all cases shall be administered openly." We have concluded that this latter provision in our state constitution affords "the public and the press the right to open and accessible court proceedings." State v. Easterling, 157 Wash.2d 167, 174, 137 P.3d 825 (2006) (citing Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 36, 640 P.2d 716 (1982)).
¶ 8 The public trial right protected by both our state and federal constitutions is designed to "ensure a fair trial, to remind the officers of the court of the importance of their functions, to encourage witnesses to come forward, and to discourage perjury." Brightman, 155 Wash.2d at 514, 122 P.3d 150 (citing Peterson v. Williams, 85 F.3d 39, 43 (2d Cir.1996) (citing Waller v. Georgia, 467 U.S. 39, 46-47, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984))). Consistent with those purposes, the United States Supreme Court has stated that public trials embody a "`view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform *314 their respective functions more responsibly in an open court than in secret proceedings.'" Waller, 467 U.S. at 46 n. 4, 104 S.Ct. 2210 (quoting Estes v. Texas, 381 U.S. 532, 588, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring)). While the right to a public trial is not absolute, it is strictly guarded to assure that proceedings occur outside the public courtroom in only the most unusual circumstances. Easterling, 157 Wash.2d at 174-75, 137 P.3d 825.

A
¶ 9 The State asserts that the trial was not closed to the public because the interviews of prospective jurors that took place in chambers occurred prior to the commencement of trial. This argument fails. The guaranty of open proceedings extends in criminal cases to "`[t]he process of juror selection,' which `is itself a matter of importance, not simply to the adversaries but to the criminal justice system.'" In re Pers. Restraint of Orange, 152 Wash.2d 795, 804, 100 P.3d 291 (2004) (quoting Press-Enter. Co. v. Superior Court, 464 U.S. 501, 505, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)). In this regard, we have expressly noted that "a closed jury selection process harms the defendant by preventing his or her family from contributing their knowledge or insight to jury selection and by preventing the venire from seeing the interested individuals." Brightman, 155 Wash.2d at 515, 122 P.3d 150 (citing Orange, 152 Wash.2d at 812, 100 P.3d 291).[2]
¶ 10 Here, as noted above, the questioning of at least 11 prospective jurors took place in the judge's chambers, and 6 of them were challenged for cause. This process was closed to the general public. The trial judge's decision to allow this questioning of prospective jurors in chambers was a courtroom closure and a denial of the right to a public trial.

B
¶ 11 Notwithstanding the lack of Bone-Club analysis by the trial court, the State urges this court to consider the Bone-Club factors on appeal and hold that the record demonstrates closing a portion of the jury voir dire to the public was justified. The presumption that trials should be open may be overcome "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." Orange, 152 Wash.2d at 806, 100 P.3d 291 (quoting Waller, 467 U.S. at 45, 104 S.Ct. 2210 (quoting Press-Enter., 464 U.S. at 510, 104 S.Ct. 819)). To assure careful, case-by-case analysis of a closure motion, a trial court faced with the question of whether a portion of a trial should be closed must ensure that the following five criteria are satisfied:
1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.
2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
4. The court must weigh the competing interests of the proponent of closure and the public.
5. The order must be no broader in its application or duration than necessary to serve its purpose.
Bone-Club, 128 Wash.2d at 258-59, 906 P.2d 325 (alteration in original) (citing Allied Daily Newspapers of Wash. v. Eikenberry, 121 Wash.2d 205, 210-11, 848 P.2d 1258 (1993)). "Thus, in order to support full courtroom *315 closure during jury selection, a trial court must engage in the Bone-Club analysis; failure to do so results in a violation of the defendant's public trial rights." Brightman, 155 Wash.2d at 515-16, 122 P.3d 150 (citing Orange, 152 Wash.2d at 809, 100 P.3d 291). When the record "lacks any hint that the trial court considered [the defendant's] public trial right as required by Bone-Club, [the appellate court] cannot determine whether the closure was warranted." Id. at 518, 122 P.3d 150 (citing Bone-Club, 128 Wash.2d at 261, 906 P.2d 325).
¶ 12 As noted above, there is no indication in the record that the trial judge engaged in the required Bone-Club analysis or made the required formal findings of fact and conclusions of law relevant to the Bone-Club criteria. Although the trial judge mentioned several times that juror interviews were being conducted in private either for "obvious" reasons, VRP (7/10/06) at 5, 10, 12, 26, 34, 37, to ensure confidentiality, or so that the inquiry would not be "broadcast" in front of the whole jury panel, Id. at 20, 30, the record is devoid of any showing that the trial court engaged in the detailed review that is required in order to protect the public trial right.
¶ 13 The determination of a compelling interest for courtroom closure is "the affirmative duty of the trial court, not the court of appeals." Bone-Club, 128 Wash.2d at 261, 906 P.2d 325. Nor is it the responsibility of this court to speculate on the justification for closure. Moreover, even if the trial court concluded that there was a compelling interest favoring closure, it must still perform the remaining four Bone-Club steps to thoroughly weigh the competing interests. Id. (citing Eikenberry, 121 Wash.2d at 212, 848 P.2d 1258). As far as we can tell, the trial court did not consider whether there were less restrictive alternatives to closure available. Unfortunately, the absence of any record showing that the trial court gave any consideration to the Bone-Club closure test prevents us from determining whether conducting part of the trial in chambers was warranted. See Brightman, 155 Wash.2d at 518, 122 P.3d 150.

C
¶ 14 The State also asserts that Strode invited or waived his right to challenge the closure when he acquiesced, without any objection, to the private questioning of jurors. However, the public trial right is considered an issue of such constitutional magnitude that it may be raised for the first time on appeal. Easterling, 157 Wash.2d at 173 n. 2, 137 P.3d 825; see also Brightman, 155 Wash.2d at 514, 122 P.3d 150; Orange, 152 Wash.2d at 800, 100 P.3d 291; Bone-Club, 128 Wash.2d at 257, 906 P.2d 325. We have held that a "defendant's failure to lodge a contemporaneous objection at trial [does] not effect a waiver." Brightman, 155 Wash.2d at 517, 122 P.3d 150 (citing Bone-Club, 128 Wash.2d at 257, 906 P.2d 325). Strode's failure to object to the closure or his counsel's participation in closed questioning of prospective jurors did not, as the dissent suggests, constitute a waiver of his right to a public trial.[3]
¶ 15 Additionally, Strode cannot waive the public's right to open proceedings. As we observed in Bone-Club, the public also has a right to object to the closure of a courtroom, and the trial court has the independent obligation to perform a Bone-Club analysis. The record reveals that the public was not afforded the opportunity to object to the closure, nor was the public's right to an open courtroom given proper consideration.[4]

*316 D
¶ 16 The State's final argument is that even if the interviewing of prospective jurors in chambers is deemed an unjustified closure, the violation was insignificant and did not infringe the constitutional right to a public trial. Some courts in other jurisdictions have held that there may be circumstances where the closure of a trial is too trivial to implicate one's constitutional right. United States v. Ivester, 316 F.3d 955 (9th Cir.2003). Trivial closures have been defined to be those that are brief and inadvertent. United States v. Al-Smadi, 15 F.3d 153, 154-55 (10th Cir.1994); Snyder v. Coiner, 510 F.2d 224, 230 (4th Cir.1975). This court, however, "has never found a public trial right violation to be [trivial or] de minimis." Easterling, 157 Wash.2d at 180, 137 P.3d 825. Furthermore, the closure here was analogous to the closures in Bone-Club and Orange. Orange, 152 Wash.2d at 804-05, 100 P.3d 291; Bone-Club, 128 Wash.2d at 259, 906 P.2d 325. As we have stated above, the trial court and counsel for the State and Strode questioned at least 11 prospective jurors in chambers. At least 6 of those prospective jurors were subsequently dismissed for cause during this period. This closure cannot be said to be brief or inadvertent.[5]

IV
¶ 17 In determining the remedy in this case, we note that "[t]he denial of the constitutional right to a public trial is one of the limited classes of fundamental rights not subject to harmless error analysis." Easterling, 157 Wash.2d at 181, 137 P.3d 825 (citing Neder v. United States, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (citing Waller, 467 U.S. 39, 104 S.Ct. 2210)). This is so because denial of the public trial right is deemed to be a structural error and prejudice is necessarily presumed. Neder, 527 U.S. at 8, 119 S.Ct. 1827 (citing Waller, 467 U.S. 39, 104 S.Ct. 2210); Easterling, 157 Wash.2d at 181, 137 P.3d 825 (citing Bone-Club, 128 Wash.2d at 261-62, 906 P.2d 325 (citing State v. Marsh, 126 Wash. 142, 146-47, 217 P. 705 (1923))). This court in Orange concluded that by improperly closing the courtroom during voir dire "the remedy for the presumptively prejudicial error [was], as in Bone-Club, remand for a new trial." Orange, 152 Wash.2d at 814, 100 P.3d 291.
¶ 18 By conducting a portion of the trial (jury voir dire) in chambers without first weighing the factors that must be considered prior to closure, prejudice to Strode is presumed. This error cannot be considered harmless and, therefore, Strode's convictions are reversed, and the case is remanded for a new trial.
WE CONCUR: SANDERS, CHAMBERS, and OWENS, JJ.
FAIRHURST, J. (concurring).
¶ 19 In State v. Momah, ___ Wash.2d ___, 217 P.3d 321 (2009), I agreed to affirm Charles Momah's convictions because the facts presented circumstances where the trial court needed to close a portion of voir dire to the public in order to protect the defendant's right to a fair trial. I reach a different conclusion here because Tony L. Strode's right to a public trial has not been waived nor has it been safeguarded as required under State v. Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (1995) (the Bone-Club analysis was adopted by the court to ensure that trial courts will be very cautious and rigorously safeguard the public trial right). Because the lead opinion conflates the rights of the defendant, the media, and the public, I concur only in the result.
*317 ¶ 20 Due to the highly publicized nature of Momah's case, the trial court in that case had no available means of avoiding jury contamination but for closing a portion of the voir dire to individually interview potential jurors.[1] Prior to the individual interviews, there was considerable discussion among the attorneys and the court about how to conduct voir dire in a way that would avoid contamination of the jury pool. One of the defendant's attorneys said, "we need to find out what the jury knows about the case ... and I would suggest we need to do individual voir dire so they don't contaminate the rest of the jury if they are otherwise not acceptable." Tr. of Proceedings on Appeal (Oct. 6, 2005) (hereinafter TP Momah) at 68, Momah. At another point, also before voir dire commenced, the attorney asked to expand the list of jurors who would be questioned individually. Various locations were discussed, with indications that the size of the jury pool needed and the availability of rooms played a part in the determination of where voir dire occurred. See, e.g., id. at 79-81; TP Momah (Oct. 10, 2005), No. 81096-6, at 156; TP Momah (Oct. 11, 2005), No. 81096-6, at 2, 4, 105. When it became obvious that the original pool of 100 jurors was inadequate, another 50 jurors were called, and defense counsel said, "I take it we will go through the same procedure as before?" TP Momah (Oct. 11, 2005), No. 81096-6, at 105. That is, individual voir dire of certain of the prospective jurors.
¶ 21 The trial court in Momah was aware at all times of the requirement that the trial be public. On October 6, 2005, before voir dire began, the trial court advised the attorneys that a television station had contacted the court about viewing jury selection. One of the defendant's attorneys was quite concerned about this and said, "I would very much object to jury selection being televised." TP Momah (Oct. 6, 2005), No. 81096-6, at 93. He added that his experience was that "they can't show the jurors anyway." Id. One of the prosecuting attorneys noted that State v. Brightman, 155 Wash.2d 506, 122 P.3d 150 (2005), had been decided that day and "talked about the fact that jury selection is open and public ... so long as it's open and public in some way, it doesn't matter to me." TP Momah (Oct. 6, 2005), No. 81096-6, at 93.
¶ 22 The trial court added that new GR 16 "presumes all proceedings are open." Id. The trial court ruled that if there was any proposed restriction of cameras, the trial court would invite the media's reaction and hold a hearing. Defense counsel noted that his experience was "that the press has in the past agreed that they will not do this ... [v]oluntarily." Id. at 94. The trial court responded that such restrictions sounded reasonable but expressed concern that GR 16 required that all proceedings are presumed open.
¶ 23 The record shows that safeguarding Momah's rights to an impartial jury and a fair trial required the closure that occurred, and that all the attorneys, the defendant, and the trial court knew that all the proceedings were presumptively open and public. The purpose of the Bone-Club inquiry is to ensure that trial courts will carefully and vigorously safeguard the public trial right. Under the circumstances in Momah's case, it is apparent that this purpose was served, and the defendant's right to a public trial was carefully balanced with another right of great magnitudethe right to an impartial jury.
¶ 24 The specific concerns underlying the Bone-Club factors were sufficiently addressed by the Momah trial court. The defendant himself established the need for private individual questioning to avoid contamination of the jury pool. There is no suggestion that Momah was denied the right to object. The individual questioning of jurors behind closed doors, whether in a courtroom or another room, was the only adequate way to sufficiently protect the defendant's right to an impartial jury, and the record shows practical matters came into play, such *318 as the size of the jury pool and room availability. The limited closure was no broader than needed to individually question jurors about what they had heard about the case and the private matters that might affect their ability to fairly hear the case. In the circumstances in Momah, the requirements and purposes of the Bone-Club analysis were met.
¶ 25 Even if the requirements were not sufficiently satisfied on the record in Momah, the court could properly conclude that the defendant waived his public trial right. A waiver is an intentional relinquishment or abandonment of a known right or privilege. State v. Sweet, 90 Wash.2d 282, 286, 581 P.2d 579 (1978) (citing Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). We have often recognized that a defendant's rights, even a right of constitutional magnitude, can be waived. While it is true the failure to object, alone, does not constitute waiver of the right to a public trial, the record in Momah shows more than a failure to object. Prior to voir dire, the defendant was expressly advised that all proceedings are presumptively public. Nonetheless, the defense affirmatively sought individual questioning of the jurors in private, sought to expand the number of jurors subject to such questioning, and actively engaged in discussions about how to accomplish this. At no time did the defendant or his counsel indicate in any way that any of the proceedings held in a closed room that was not a courtroom violated his public trial right. The record shows the defendant intentionally relinquished a known right.
¶ 26 The lead opinion here states that the right to a public trial is set forth in the same provisions as the right to a jury trial and, therefore, "[i]t seems reasonable ... that the right to a public trial can be waived only in a knowing, voluntary, and intelligent manner." Lead opinion at 315 n. 3. If the lead opinion means that only an on-the-record colloquy showing such a waiver will suffice, I disagree. Waiver of many important constitutional rights may occur without an on-the-record colloquy. See, e.g., State v. Stegall, 124 Wash.2d 719, 881 P.2d 979 (1994) (waiver of the right to a 12-person jury may be shown by a personal statement from the defendant expressly agreeing to waiver or an indication that the judge or defense counsel discussed the issue with the defendant prior to the attorney's waiving the right); State v. Thomas, 128 Wash.2d 553, 559, 910 P.2d 475 (1996) (no requirement of on-the-record waiver of the right to testify is required); State v. Woods, 143 Wash.2d 561, 608-09, 23 P.3d 1046 (2001) (no on-the-record colloquy required for waiver of a capital defendant's right to present mitigating evidence); City of Bellevue v. Acrey, 103 Wash.2d 203, 208-11, 691 P.2d 957 (1984) (on-the-record colloquy is preferred for waiver of right to representation of counsel and choice of self-representation, but absent such evidence, court will examine record and waiver may be found if it shows actual awareness of risks of self-representation); State v. Garza, 150 Wash.2d 360, 367, 77 P.3d 347 (2003) (waiver of right to be present at trial must be voluntary and knowing, but once trial has begun in the defendant's presence, a subsequent voluntary absence acts as implied waiver of the right).
¶ 27 Unlike the situation presented in Momah, here the record does not show that the court considered the right to a public trial in light of competing interests. The record does not show a knowing waiver of the right to a public trial. Although the dissent addresses the right of jurors to privacy, the record does not show that this interest was considered together with the right to a public trial. I agree with the dissent that "public exposure of jurors' personal experiences can be both embarrassing and perhaps painful for jurors." Dissent at 320. I agree that jurors' privacy is a compelling interest that trial courts must protect. I agree that had the trial judge failed to close a portion of voir dire to the public, he would have "undermined the court's procedural assurances that juror information will remain private [and] would have jeopardized jurors' candidness and potentially the defendant's right to an impartial jury." Id. at 320 (emphasis added). But the potential for jeopardizing a defendant's right to an impartial jury does not necessitate closure; it necessitates a weighing of the competing interests by the trial court. Because, unlike in Momah, the record does not show that this occurred, this *319 case fits into the category of cases where expressly engaging in the Bone-Club analysis on the record is required. The trial court here erred in failing to engage in the Bone-Club analysis.
¶ 28 While I agree with the lead opinion's result in this case, I do not agree with its conflation of the rights of the defendant, the media, and the public. A defendant should not be able to assert the right of the public or the press in order to overturn his conviction when his own right to a public trial has been safeguarded as required under Bone-Club or has been waived.
¶ 29 For the foregoing reasons, I concur with the lead opinion's holding requiring automatic reversal and remand.
I CONCUR: MADSEN, J.
C. JOHNSON, J. (dissenting).
¶ 30 For the reasons outlined in this court's opinion in State v. Momah, ___ Wash.2d ___, 217 P.3d 321 (2009), Tony Strode's conviction should be affirmed. However, this case presents one critical factor not addressed in Momah or given adequate consideration by the plurality or concurrence here: the importance of jurors' privacy interests. Like the dissent in Momah, the plurality adheres strictly to its rule of automatic reversal whenever a closure occurs, regardless of underlying circumstances of the case before it. In doing so, the plurality neglects to balance the defendant's right to an impartial jury with his right to a public trial under article I, section 22 of the state constitution and fails to consider the defendant's participation in and obvious benefit from the closure.
¶ 31 In this case, the plurality dismisses out of hand the legitimate privacy interests of jurors. Juror privacy and candidness is particularly important in cases like this that involve extremely sensitive matters. A review of the record in this case demonstrates that the trial judge balanced the compelling interests of juror privacy with the defendant's right to a public trial by an impartial jury and ordered a narrowly tailored closure that protected jurors' interests and ensured an impartial jury.

Record
¶ 32 Strode was charged with rape of a child in the first degree, attempted rape of a child in the first degree, and child molestation in the first degree. Given the sensitive nature of these charges, a written, confidential questionnaire was given to jurors. In it, the jurors were asked whether they, or anyone close to them, had either been a victim of sexual abuse or accused of committing sexual abuse. Approximately 11 jurors answered "yes" to that question. One juror had been accused of misconduct against a boy and had lost his foster care license. Two of the jurors had been sexually abused or raped. Seven jurors had close friends or family who had been sexually assaulted.
¶ 33 In response to these answers, defense counsel agreed the court should individually voir dire the 11 jurors. Further, defense counsel actively participated in the in-chambers questioning and exercised challenges for cause based on juror bias.
¶ 34 Before talking to each juror, the court made the purposes of individual questioning clear: to spare the jurors embarrassment of public questioning on these sensitive subjects and to facilitate full responses to the lawyers' questions to ensure fairness and impartiality. For example, the judge began voir dire with one juror as follows:
[Juror No. 41, you] answered yes to both questions on the juror questionnaire, and, of course, the reason we ask these confidentially is so we don't have to broadcast it... to the whole rest of the jury panel. But its [sic] important that we know whether it might affect your ... fairness and impartiality....[[1]]
We should recognize, as the trial court did here, that jurors have a compelling interest in maintaining confidentiality in their private, personal affairs and that those interests are integrally connected to the defendant's right to an impartial jury.

*320 Juror Privacy and the Impartial Jury Right

¶ 35 In order to ensure a defendant receives a fair jury trial, the court must facilitate processes that allow a defendant to make his case before an impartial jury; article I, section 22 guarantees this right. An impartial jury is comprised of individual jurors who have the ability and willingness to decide a case free of bias and on the evidence presented at trial. In order to empanel an impartial jury, the parties may engage in voir dire. Voir dire plays a critical role in ensuring a fair trial because it allows counsel to inquire into potential bias.
¶ 36 In cases such as this involving sexual abuse, counsel may voir dire jurors about experiences that may touch on deeply personal issues that might affect their ability to be fair and impartial. Jurors' willing and truthful disclosure of private information regarding such experiences is essential to ensuring the defendant's impartial jury right. Without jurors' disclosures, counsel cannot effectively exercise challenges to remove biased jurors from the venire.
¶ 37 However, public exposure of jurors' personal experiences can be both embarrassing and perhaps painful for jurors. Jurors may have good reasons for keeping their personal information out of the public domain. Therefore, in cases such as this one, courts must allow counsel to conduct voir dire in a way that facilitates candidness, safeguards juror privacy, and enables parties to vet biased and partial jurors. That is exactly what the trial judge did in this case by closing a portion of voir dire to the public. Had the judge failed to do so, counsel would not only have undermined the court's procedural assurances that juror information will remain private but also would have jeopardized jurors' candidness and potentially the defendant's right to an impartial jury.

Procedural Assurances
¶ 38 Courts routinely assure prospective jurors through a variety of methods that their private information need not be disclosed to the public. Among these methods are the general court rules, Washington courts' juror guide, and juror questionnaires.
¶ 39 General Rule (GR) 31 is a procedural tool that facilitates juror privacy. This court rule states that "[i]ndividual juror information, other than name, is presumed to be private," and the rule also sets forth procedures for gaining juror information upon showing of good cause. GR 31(j). We adopted GR 31(j) in acknowledgment of the importance of juror privacy. Prospective jurors should reasonably expect courts to abide by GR 31 during voir dire.
¶ 40 Additionally, the Washington Courts: A Juror's Guide[2] assures jurors that confidential information may be privately disclosed to the judge. In describing voir dire, the guide explains that jurors may be asked personal questions that must be answered "completely and honestly," but the guide assures jurors "if [they] are uncomfortable answering [such personal questions], tell the judge and he/she may ask them privately."[3] This guide acknowledges juror privacy interests and assures them that courts provide protective measures to ensure confidentiality.
¶ 41 Further, juror questionnaires give explicit assurances of confidentiality. For example, in this case, counsel submitted a juror questionnaire, which stated:
This case involves an allegation of sexual contact by defendant with a minor child. As a result, the court needs you to respond to the following questions ... [y]our answers will be revealed only to the Prosecuting Attorney, the Defendant's Attorney, the Defendant, the Judge, her/his staff and the Clerk, each of whom are under court order to keep the information confidential and under seal.[[4]]
*321 When jurors respond to the questions, they should reasonably expect courts to be truthful and maintain the confidentiality of extremely sensitive, personal, and perhaps traumatic experiences.
¶ 42 Through the above methods, as well as other means, courts routinely assure jurors that their private information will remain private. The courts' assurances serve at least two purposes: to respect individuals' privacy interests and to guarantee an impartial jury. The trial court's decision in this case to order a temporary closure of a portion of voir dire is consistent with these purposes and furthered the primary goal of Bone-Club's[5] balancing test: to protect the defendant's right to a fair trial.

Balancing Interests
¶ 43 The plurality recognizes the trial court's affirmative duty to safeguard the public trial right by engaging in Bone-Club's five-factor balancing test. Plurality at 314. However, the plurality's contention that the record "`lacks any hint that the trial court considered [the defendant's] public trial right as required by Bone-Club ...'" is not an accurate representation of the record. Plurality at 315 (alteration in original) (quoting State v. Brightman, 155 Wash.2d 506, 518, 122 P.3d 150 (2005)).
¶ 44 Although the trial judge did not conduct an explicit Bone-Club analysis, she implicitly balanced the interests at stake before temporarily closing the courtroom. First, as demonstrated above, the trial court identified two compelling interests that would be jeopardized by open voir dire: the defendant's right to public trial by an impartial jury and jurors' privacy interests. Second, the defendant could have objected to the in-chambers voir dire at any time prior to the closure, but he chose not to and, instead, actively participated in the questioning. Third, the temporary closure was narrowly tailored to protect the interests of those 11 jurors who identified themselves as experiencing or accused of committing sexual abuse. Fourth, the record does not indicate that any members of the public were present to object to the closure. Fifth, the in-chambers questioning focused primarily on the jurors' answers to the two questionnaire queries involving their experiences with sexual abuse.
¶ 45 Thus, contrary to the plurality's contention that the record "lacks any hint" that the trial judge engaged in weighing the competing interests, the record demonstrates that the trial court implicitly considered and ultimately safeguarded both the jurors' privacy interests and the defendant's impartial jury right.

Conclusion
¶ 46 The plurality's strict adherence to the automatic reversal rule for the trial court's failure to perform an explicit Bone-Club analysis leads it to neglect the specific facts, rights, and interests at stake in this case. The plurality ignores Strode's right to an impartial jury under article I, section 22 and dismisses the legitimate privacy interests of jurors. As in Momah, requiring an automatic reversal of Strode's conviction gives the defendant a windfall for participating in and likely benefiting from the very closure he now claims as error. Additionally, the plurality's failure to give due consideration to jurors' privacy interests undermines the court's assurances that jurors' private information will remain private and jeopardizes the defendant's right to an impartial jury.
WE CONCUR: PENOYAR, J.P.T., and J. JOHNSON, J.
NOTES
[1] It is possible that more than 11 prospective jurors were interviewed in chambers, but this is not clear from the record since it appears that the trial court's recording device either malfunctioned or was turned off.
[2] We note, also, the provision in our state constitution that provides that victims of crimes have the right to "attend trial and all other court proceedings the defendant has the right to attend." WASH. CONST. art. I, § 35.
[3] The right to a public trial is set forth in the same provision as the right to a trial by jury, and it is difficult to discern any reason for affording it less protection than we afford the right to a jury trial. It seems reasonable, therefore, that the right to a public trial can be waived only in a knowing, voluntary, and intelligent manner. See City of Bellevue v. Acrey, 103 Wash.2d 203, 207-08, 691 P.2d 957 (1984) (waiver of the jury trial right must be affirmative and unequivocal).
[4] The concurring justice asserts that any discussion of the public's right to open trials conflates the rights of the defendant and the public because a defendant should not be able to assert the rights of the public or press. Strode has not asserted any rights belonging to the public or press concerning public trials. We address the right of the public because courts have the overriding responsibility to ensure that the public's right to open trials is protected. This responsibility is laid out in the fourth Bone-Club criterion.
[5] The dissent attempts to justify the trial court's closure of voir dire, and in the process makes several errors of analysis. First, the competing interests are not the defendant's right to an impartial jury weighed against the right to a public trial. Rather, the public trial right is weighed against the trial court's preference for conducting individual questioning in chambers. Second, whether or not the defendant benefited from closure says nothing of the public's right to open trials guaranteed by article I, section 10 of our state constitution. Third, the dissent does not explain why the only alternative to protecting juror privacy was in-chambers questioning, as opposed to individual questioning in the courtroom. Fourth, the merit of the closure is not the issue. Instead, we focus only on the procedure used by the trial court prior to closure.
[1] The court did not order or direct closure. The record in Momah shows that the trial judge apparently believed the proceedings were not closed at all. However, a de facto closure occurred as a result of the locations and physical conditions existing when jurors were individually questioned outside the courtroom in a room not ordinarily accessed by the public with the door closed.
[1] Br. of Amicus Curiae Washington Association of Prosecuting Att'ys at 3.
[2] Prepared by the Superior Court Judges' Association and the District and Municipal Court Judges' Association of the state of Washington.
[3] Washington Courts: A Juror's Guide, http:www. courts.wa.gov/newsi nfo/resources/?fa=newsinfo_jury.jury_guide
[4] Confidential juror questionnaire attached as an appendix to Respondent's Brief to the Court of Appeals.
[5] State v. Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (1995).