
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, ) | No. 67357-2-I |
| ) | |
| Respondent, ) | |
| ) | DIVISION ONE |
| v. ) | |
| ) | |
| RAMOS NOEL ORTIZ-LOPEZ, ) | UNPUBLISHED OPINION |
| ) | |
| Appellant. ) | FILED: March 25, 2013 |
| _____ ) | |

BECKER, J. — Appellant Ramos Ortiz-Lopez was convicted of two counts of first degree child rape and one count of second degree child rape for acts involving his daughter. We reject Ortiz's contention that his public trial rights were violated. We affirm the convictions and remand for vacation of the challenged conditions of community custody.

The information charged Ortiz with four counts of first degree child rape occurring between July 28, 2004, and July 27, 2008, each involving "separate and distinct" acts against his daughter, AWO. AWO was less than 12 years old during this period. The information also charged Ortiz with one count of second degree child rape of AWO occurring between July 28, 2008, and December 31, 2008. She was 12 years old during this charging period.

On April 29, 2011, the jury found Ortiz guilty of two counts of first degree child rape and acquitted him of the remaining two first degree counts. The jury convicted him of the single count of second degree child rape. This appeal followed.

## DOUBLE JEOPARDY

After the trial, Ortiz moved to dismiss one of the first degree child rape convictions, arguing the court's failure to give a "separate and distinct" acts instruction as to the four identically charged counts resulted in a double jeopardy violation under State v. Mutch, 171 Wn.2d 646, 254 P.3d 803 (2011). He appeals the court's denial of the motion.

The constitutional guaranty against double jeopardy protects a defendant against multiple punishments for the same offense. U.S. CONST. amend. V; WASH. CONST. art. 1, § 9; Mutch, 171 Wn.2d at 661. This court's review is de novo. Mutch, 171 Wn.2d at 662.

In Mutch, the case on which Ortiz principally relies, the State charged five identical counts of rape, all within the same charging period. There was sufficient evidence of separate acts of rape to support all five counts, but the jury was not instructed that each count had to arise from a separate and distinct act in order to convict. The defendant argued that double jeopardy arose from the possibility that the jury convicted on all five counts based on a single criminal act. The court held that the absence of a separate and distinct acts instruction created only a *potential* double jeopardy problem. Mutch, 171 Wn.2d at 662. Mutch disapproved of State v. Berg, 147 Wn. App. 923, 935, 198 P.3d 529 (2008), and

State v. Carter, 156 Wn. App. 561, 568, 234 P.3d 275 (2010), to the extent they found *automatic* double jeopardy violations where the trial court failed to give a separate and distinct acts instruction.

Although the jury instructions in Mutch were deficient, the court nevertheless upheld all five convictions after determining that the information, instructions, testimony, and argument clearly demonstrated that the State was not seeking to impose multiple punishments for the same offense. Mutch, 171 Wn.2d at 663-65, quoting State v. Hayes, 81 Wn. App. 425, 440, 914 P.2d 788, review denied, 130 Wn.2d 1013 (1996).

In Mutch, the number of rape counts corresponded exactly with the number of acts the victim alleged and the number of episodes the State referenced in its arguments. Mutch, 171 Wn.2d at 665-66. That was not the case here. As the State acknowledged in argument, AWO's testimony suggested many more acts than the number of counts charged. She testified to numerous acts of rape occurring in the charging period, including a fair amount of "generic" testimony about acts that occurred frequently and were not differentiated from each other by specific details. See Hayes, 81 Wn. App. at 435.

The charging period for the four counts of first degree child rape, before AWO turned 12 years old in July 2008, corresponded roughly to 4 years during which the family lived in two different apartments that AWO described at trial. In the first apartment, Ortiz slept in the living room, while AWO and her brothers slept in one bedroom. AWO recalled going to sleep in her own bed but waking

3

up on the floor of the living room with her clothes off and Ortiz touching her inappropriately: "he was putting his hands on my vagina." AWO said she told her father to stop, and he told her to go back to sleep.

In the second apartment, AWO slept in one bedroom, and her brothers shared the other bedroom, while Ortiz slept downstairs. They moved to this apartment when AWO was in third or fourth grade and lived there for a year or more. AWO said she started sleeping with her father after watching a scary movie one night. She testified that every night she slept with Ortiz, he performed oral sex on her, put his fingers in her vaginal area, or put his penis in her vagina. AWO said she was in fourth grade when her father first put his penis inside her. She said he would hold her hands and feet down during intercourse, and although she would scream for her brothers, they never heard her because they were sleeping. She recalled her vagina "stinging really bad." AWO testified that intercourse occurred frequently. She could not estimate how many times.

In 2007, the family moved into a three-bedroom apartment in the same complex. AWO said that in this apartment, she continued sleeping with her father until the fall of 2008, when she was 12 years old and in seventh grade. AWO and Ortiz had separate rooms, and the boys slept in another bedroom across the hall from Ortiz's bedroom. AWO said sexual activity occurred in Ortiz's bedroom every time she slept with him, which happened often because she was afraid to sleep alone. She remembered "the same things happening with the other apartments." She recalled that once they performed oral sex on each other simultaneously, but it is not clear whether this particular act occurred

before or after she turned 12. AWO testified that the last incident of sexual intercourse occurred in fall of 2008 when she was 12 and Ortiz had a girl friend named Corrina.

Because there was testimony about numerous incidents of sexual abuse, Ortiz contends it was not manifestly apparent to the jury that each conviction for first degree child rape had to be based on a separate and distinct act.

As in Mutch, the jury here was instructed that a separate crime was charged in each count, and it must decide each count separately. Instruction 5. On its own, this instruction is "not saving" because it fails to inform the jury that each crime requires proof of a different act. Mutch, 171 Wn.2d at 663. But a unanimity instruction helps to protect against a double jeopardy violation if it informs the jury that at least one particular act must be proved beyond a reasonable doubt for each count. Mutch, 171 Wn.2d at 663. Here, the jury was so informed by instruction 13:

> The State alleges that the defendant committed acts of Rape of a Child in the First Degree on multiple occasions. To convict the defendant on any count of Rape of a Child in the First Degree, one particular act of Rape of a Child in the First Degree must be proven beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of Rape of a Child in the First Degree.

In opening statement, the prosecutor specifically stated, "We're alleging a separate act for each count." In closing, the prosecutor highlighted instruction 13, explaining the importance of unanimous agreement as to the particular act that supported each count. Defense counsel also emphasized this instruction.

5

In closing argument, the prosecutor acknowledged that AWO's testimony suggested many more acts than there were counts. The prosecutor identified a separate evidentiary basis for each of the four counts of first degree child rape. See Hayes, 81 Wn. App. at 440. She reviewed AWO's testimony and argued that it supported at least one act of rape by digital penetration at the first apartment, and intercourse at least twice and oral sex at least once at the second apartment.

Significantly, the jury acquitted Ortiz on two of the four charged counts of first degree child rape. These acquittals indicate the jury knew that unanimous agreement on any one act could not support a conviction on more than one first degree child rape count.

We conclude it was manifestly apparent to the jury that the State was not seeking to impose multiple punishments upon Ortiz for the same offense and that each conviction for first degree child rape had to be based on a separate and distinct act.

## JUROR UNANIMITY

The charging period for the single count of second degree child rape was from July 28, 2008, AWO's twelfth birthday, to December 31, 2008. During this time, the family was living in the third apartment, the one with three bedrooms.

Ortiz moved for a new trial based in part on the court's failure to give a unanimity instruction as to the second degree count, pursuant to State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984). While Instruction 13 informed the jury of the unanimity requirement with respect to the four counts of first degree

child rape, there was no unanimity instruction pertaining specifically to the one count of second degree child rape. The trial court denied the motion for a new trial. "The testimony was that the same thing happened on an almost daily basis. The differences were indistinguishable. Petrich would not be applicable." Ortiz contends reversal of the conviction is required because of a high risk the jury was not unanimous as to the act supporting the conviction.

Criminal defendants have a constitutional right to a unanimous jury verdict. WASH. CONST. art. 1, § 21. When the evidence indicates that several distinct criminal acts have been committed, but the defendant is charged with only one count, the State "may, in its discretion, elect the act upon which it will rely for conviction." Petrich, 101 Wn.2d at 572. Alternatively, the jury must be instructed to agree on a specific criminal act. Petrich, 101 Wn.2d at 572. Generic testimony that outlines a series of specific but undifferentiated acts does not violate the unanimous verdict requirement. Hayes, 81 Wn. App. at 437.

The State concedes that the failure to give a unanimity instruction as to count 5 was error. We accept the concession, recognizing that the Supreme Court has allowed the option of a unanimity instruction as an alternative to election of a particular act by the State precisely because the pattern of multiple instances of criminal conduct with the same child victim is seen frequently and in such cases an election of one particular act for conviction may be impractical. Petrich, 101 Wn.2d at 572. For a discussion of the general problem of assuring juror unanimity where the testimony is generic, see State v. Brown, 55 Wn. App. 738, 746-49, 780 P.2d 880 (1989), review denied, 114 Wn.2d 1014 (1990).

7

We also agree with the State that the error was harmless under State v. Bobenhouse, 166 Wn.2d 881, 894-95, 214 P.3d 907 (2009), and State v. Camarillo, 115 Wn.2d 60, 62-72, 794 P.2d 850 (1990). Where the victim testifies to a number of similar incidents of sexual abuse to support a single count, any one of which is sufficient to establish the crime, and there is no conflicting testimony that would allow the jury to rationally discriminate between the several incidents, then any failure to give the Petrich instruction is harmless beyond a reasonable doubt. Bobenhouse, 166 Wn.2d at 894-95.

AWO's testimony about the sexual abuse that occurred after her twelfth birthday was generic. She said she was still sleeping with her father while in the third apartment, and the same things kept happening as previously had occurred, i.e., digital penetration, vaginal intercourse, and oral sex. Ortiz denied that any abuse happened.

Ortiz relies on two cases involving child sex abuse where the failure to give a unanimity instruction was not excused, State v. York, 152 Wn. App. 92, 96, 216 P.3d 436 (2009), and State v. Coleman, 159 Wn.2d 509, 150 P.3d 1126 (2007). In each case, omission of the instruction was found to be prejudicial because there was conflicting testimony that jurors might have resolved in different ways. In York, a witness gave the defendant an alibi during the relevant time period. In Coleman, there was conflicting evidence about whether one particular act of molestation occurred during the movie "Snow Dogs." The child witness told one interviewer she was molested during the movie, and she told

8

another interviewer that nothing happened at the movie. Coleman, 159 Wn.2d 509, 514-15.

In this case, there was no evidence suggesting that AWO's testimony was inaccurate as to the specifics of her account. Ortiz said no abuse happened at any time. Other defense witnesses attacked AWO's credibility generally but not specifically. The situation here is more like in Bobenhouse, where the child's testimony relating to one particular count of child rape detailed two separate incidents sufficient to establish the count, one incident involving fellatio and the other involving digital penetration of the child's anus. The court held the lack of a unanimity instruction was harmless because if the jury "reasonably believed that one incident happened, it must have believed each of the incidents happened." Bobenhouse, 166 Wn.2d at 895. Similarly here, if a jury believed AWO's testimony that frequent acts of digital penetration, vaginal intercourse, and oral sex continued after she was 12, there was no particular reason for a juror to believe that some particular act of rape occurred but some other act of rape did not.

We conclude the failure to give a unanimity instruction as to the count of second degree child rape was harmless error.

COURT CLOSURE ISSUES

Ortiz argues his public trial rights were violated when the court sealed jury questionnaires, questioned four prospective jurors in another courtroom away from venire members, and conducted peremptory challenges in an unreported

9

sidebar.

Jury selection occurred on April 25, 2011. Prospective jurors completed a one page confidential questionnaire that asked about their experiences with sexual abuse and whether they preferred to discuss their answers outside the presence of other jurors. Some prospective jurors wished to be interviewed separately. At 4:48 p.m., after voir dire with the venire panel as a whole had been completed, the judge left the courtroom where the panel was assembled and moved with counsel, Ortiz, four prospective jurors, and the reporter to another public courtroom. The judge asked counsel if they felt he should do an analysis under State v. Bone-Club, 128 Wn.2d 254, 906 P.2d 325 (1995), and go into chambers. Counsel agreed that questioning the four jurors in another public courtroom made it unnecessary to do a Bone-Club analysis.

Defense counsel said, "The only concern I have is making sure that the doors to the courthouse are still open . . . and that the public can actually get in." Security personnel ascertained the doors were still open, and the judge said, "The record should reflect the courthouse doors are open."[1]

The four prospective jurors were briefly questioned, one by one, in a reported proceeding. Two were excused for cause. The other two were sent back to the first courtroom. The judge said there would be a short break so the attorneys could "go over notes." He suggested they could return to the first courtroom where the prospective jurors who had not yet been excused were still assembled, to "take a look at them." Defense counsel agreed that would be

---

[1] Supplemental Report of Proceedings (4/25/11) at 3.

helpful. At 5:28, after the break, with the judge, counsel, and Ortiz now back in the first courtroom, the judge invited counsel to a sidebar. Although the sidebar was not reported, it is undisputed that what occurred there was the exercise of peremptory challenges. Neither party objected to the sidebar or to the peremptories that were exercised. After the sidebar, the judge announced that the jury had been selected. The judge called out the names and numbers of the 14 jurors selected (including two alternates) and excused the remaining members of the venire.

The clerk's minutes and the supplemental report of proceedings indicate Ortiz was present in the courtroom throughout these proceedings. The record includes a seating chart with the names of the jurors who were selected, and a three page "judge's list" documenting what happened to the prospective jurors who were not selected. The list identifies each person who was excused by the State's peremptory challenges and in what order, and it shows the same information for the defense.[2]

The clerk's minutes for April 25, 2011, state, "Jury questionnaires are held under seal with trial exhibits in vault." On May 11, 2011, the court entered an order sealing the jury questionnaires that made no mention of the Bone-Club factors.

*Sealing of Juror Questionnaires*

Ortiz contends preventing public access to the jury questionnaires amounted to a courtroom closure, and by ordering them sealed without first

---

[2] Supplemental Clerk's Papers at 146-49.

conducting a Bone-Club analysis, the court committed a structural error warranting automatic reversal of his convictions. This argument is foreclosed by the recent opinion of our Supreme Court in State v. Beskurt, __ Wn.2d __, 293 P.3d 1159 (2013). Restriction of public access to juror questionnaires does not result in a closure under Wash. Const. art. I, § 10 or art. I, § 22.

*Questioning of Jurors Away from Rest of Venire*

In a statement of additional grounds pursuant to RAP 10.10, Ortiz contends the court erred by not analyzing the Bone-Club factors "before conducting the private jury voir dire," thus excluding the public and violating his right to a public trial. We do not accept the characterization of what occurred as a private voir dire. The court merely questioned four jurors in another public courtroom, in the presence of counsel and Ortiz, and away from the other venire members. This was not a "closure" necessitating a Bone-Club analysis. A closure occurs when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave. State v. Lormor, 172 Wn.2d 85, 91, 257 P.3d 624 (2011); State v. Sublett, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). Here, the court was careful to ensure that the courtroom in which the four jurors were being separately questioned remained open to the public.

*Peremptory Challenges at Sidebar*

Ortiz has filed a supplemental assignment of error challenging the sidebar conference where counsel exercised peremptory challenges. He contends that the taking of peremptory challenges at sidebar amounted to a courtroom closure that violated his right to a public trial and constituted structural error because it

12

was not preceded by a Bone-Club analysis.

Article I, section 10 of our state constitution provides, "Justice in all cases shall be administered openly." This provision grants the public an interest in open, accessible proceedings. Lormor, 172 Wn.2d at 91. The public trial right "serves to ensure a fair trial, to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, to encourage witnesses to come forward, and to discourage perjury." Sublett, 176 Wn.2d at 72.

The right to a public trial includes voir dire. Presley v. Georgia, 558 U.S. 209, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010). The right to a public trial is violated when jury selection is conducted in chambers rather than in an open courtroom without consideration of the Bone-Club factors. See, e.g., State v. Strode, 167 Wn.2d 222, 227, 217 P.3d 310 (2009) (Alexander, C.J. plurality opinion); 167 Wn.2d at 235-36 (Fairhurst, J. concurring). By analogy to these authorities, Ortiz contends the sidebar conference was no less a violation of the public trial right than voir dire conducted in chambers.

The analogy is flawed. The courtroom itself was not closed. All voir dire was carried on in open court. Challenges for cause were made and decided in open court. None of the peremptory challenges were contested. There was no need for the court to make any decisions on the peremptories. There is no basis to assume that anything occurred other than the verbal communication, by counsel to the court, of the names of the prospective jurors each counsel had decided to excuse by the right of peremptory challenge—a communication that

13

just as easily could have been accomplished by counsel writing the names on slips of paper and handing them to the judge.

Not every interaction between the court, counsel, and defendants will implicate the right to a public trial, or constitute a closure if closed to the public. Sublett, 176 Wn.2d at 71. To decide whether a particular process must be open to the press and the general public, the Sublett court adopted the "experience and logic" test formulated by the United States Supreme Court in Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986). Sublett, 176 Wn.2d at 73. Applying that test, the Sublett court held that no violation of the right to a public trial occurred when the court considered a jury question in chambers. Sublett, 176 Wn.2d at 74-77. "None of the values served by the public trial right is violated under the facts of this case. . . . The appearance of fairness is satisfied by having the question, answer, and any objections placed on the record." Sublett, 176 Wn.2d at 77.

Because their briefs were filed before our Supreme Court's decision in Sublett, the parties here have not had the opportunity to brief the experience and logic test in connection with the issue of whether a closure occurs when a court conducts a sidebar to allow counsel to exercise peremptory challenges. On this record, we hold the sidebar was not a closure. We believe this holding is consistent with Sublett. Cf. People v. Willis, 27 Cal. App. 4th 811, 821-22, 43 P.3d 130 (2002) (courts may use sidebar conferences followed by appropriate disclosure in open court of successful challenges). Because the sidebar was not a closure, the court was not required to conduct a Bone-Club analysis.

14

It was the substance of the peremptory challenges that implicated the values inherent in our constitutional provision for the open administration of justice. A record of information about how peremptory challenges were exercised is important, for example, in assessing whether there was a pattern of race-based peremptory challenges. See Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); Georgia v. McCollum, 505 U.S. 42, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992). In this regard, the practice adopted by the trial court served the purpose. The court carefully recorded the names of the prospective jurors who were removed by peremptory challenge, as well as the order in which each challenge was made and the party who made it. This document is easily understood, and it was made part of the open court record, available for public scrutiny. This procedure satisfied the court's obligation to ensure the open administration of justice.

*Right To Be Present*

Ortiz also argues that excluding him from the sidebar violated his constitutional right to be present at a critical stage of the trial. A defendant has a fundamental right to be present at all critical stages of a trial, including voir dire and the empanelling of a jury. State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011); see also State v. Slert, 169 Wn. App. 766, 775, 282 P.3d 101 (2012). In Irby, the defendant was to be tried for murder. Prospective jurors were asked to fill out a questionnaire, with voir dire set to begin the next day. Some members of the jury panel indicated in their responses to the questionnaire that a three week trial would be a hardship for them, or that a parent had been murdered.

15

That same day, the trial judge exchanged e-mails with counsel about the possibility of reaching agreement about excusing those jurors so they would not have to appear for voir dire. Irby had no opportunity to participate in the e-mail exchange. Counsel stipulated to the dismissal of seven potential jurors for cause without Irby ever seeing them. The Supreme Court found a constitutional violation because in the e-mail exchange, jurors were "being evaluated individually," Irby, 170 Wn.2d at 882, and Irby missed the opportunity to give advice and suggestions to defense counsel in this process. Irby, 170 Wn.2d at 883; see also Slert, 169 Wn. App. at 771 (after an unreported in-chambers conference, four jurors were excused for cause based on questionnaire answers indicating they had some knowledge about the defendant's prior trials.)

This case is not like either Irby or Slert. Ortiz was present during all the voir dire proceedings, including the proceeding where the four prospective jurors were questioned separately in open court. After voir dire was completed and before the peremptory challenges were exercised, there was a break. Unlike Irby, who had no opportunity to provide input on the e-mail exchange, Ortiz had the opportunity to consult with his lawyer throughout voir dire and before and after the sidebar conference. He was present in the courtroom when the sidebar occurred. The sidebar involved peremptory challenges, not challenges for cause. It produced no contested issues and no decision-making by the judge. Under these circumstances, there was no violation of Ortiz's right to be present at a critical stage.

16

CONDITIONS OF COMMUNITY CUSTODY

Ortiz challenges eight conditions of community custody included in his sentence. The State agrees to vacation of all of these conditions. We accept the concessions for the reasons discussed below.

The court has discretion to impose "crime-related prohibitions" as conditions of community custody. Former RCW 9.94A.700(5)(e) (2003). The court imposed several prohibitions related to Internet and computer use. See special conditions 15, 16, 18, 19, and 20. But the State presented no evidence that computer or Internet use contributed in any way to Ortiz's offenses, and the trial court made no such findings. These conditions should be stricken.

In special conditions 7 and 8, the court ordered Ortiz not to possess pornographic materials as defined by the sex offender therapist and/or community corrections officer, and not to possess sexual stimulus materials for his particular deviancy as defined by his community corrections officer and therapist except for therapeutic purposes. These conditions must be stricken as unconstitutionally vague under State v. Bahl, 164 Wn.2d 739, 744-45, 193 P.3d 678 (2008).

Special condition 14 prohibited Ortiz from possessing drug paraphernalia. But no evidence was presented that drugs, or possession of drug paraphernalia, bore any relation to Ortiz's offenses. Moreover, mere possession of drug paraphernalia is not a crime. State v. George, 146 Wn. App. 906, 918, 193 P.3d 693 (2008). The condition should be stricken because it is not crime-related. We do not reach the issue of whether the condition is also unconstitutionally vague.

17

The two convictions for first degree child rape are affirmed. The conviction for second degree child rape is affirmed. We remand for vacation of the challenged conditions of community custody.

Becker, J.

WE CONCUR: