IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 26404-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMEL WILLIAM DALLUGE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

BROWN, J. — Amel W. Dalluge appeals his 2006 second degree assault conviction for punching another inmate in the Grant County jail. Because he partly contends his public trial rights were violated when the trial court allowed private examination of certain jurors in a side room, this court stayed his case to await the disposition of like Supreme Court cases. *See In re Pers. Restraint of Morris*, 176 Wn.2d 157, 288 P.3d 1140 (2012); *State v. Sublett*, 176 Wn.2d 58, 292 P.3d 715 (2012); *State v. Paumier*, 176 Wn.2d 29, 288 P.3d 1126 (2012); *State v. Wise*, 176 Wn.2d 1, 288 P.3d 1113 (2012). Under the developed case law, we conclude Mr. Dalluge's public trial rights were violated. Thus, we do not reach his self-defense contentions or address his statement of additional grounds for review alleging health record and jury questionnaire concerns. Accordingly, we reverse.

FACTS

Kris Nichols (now deceased) and Amel Dalluge were inmates in a Grant County jail dormitory. Mr. Nichols and Mr. Dalluge did not get along. One day while Mr. Dalluge was in the jail dormitory's upper level, an officer brought Mr. Nichols in a wheelchair into the dormitory's lower level. When the officer turned his back, Mr. Dalluge charged Mr. Nichols and punched him in the nose. Mr. Dalluge then celebrated with a dance and stated, "I got you." Report of Proceedings (RP) at 99.

The State charged Mr. Dalluge with second degree assault. During pretrial hearings, defense counsel informed the court he had decided not to assert a self-defense claim, apparently to Mr. Dalluge's dissatisfaction. On the first morning of trial, the trial court granted Mr. Dalluge's self-representation request (with stand-by counsel), but rejected his self-defense claim and related witnesses.

Before beginning voir dire, the trial court without consulting the parties, told the jury the goal was to empanel an impartial jury and they needed to tell the truth. The court explained: "If answering a question truthfully would require you to say something that you would prefer not to make public, just say, 'I'd like to answer privately.' If you do, we'll go through a little exercise where you alone and the parties and I go into a side room, we'll take your answer there, and then return to the courtroom. It is much more important that we have the benefit of your candid answer than it is to receive it in a public setting." RP at 6-7.

2

During voir dire, the judge asked the potential jurors if anyone had heard about the case. Two jurors raised their hands. Juror 46 stated the information he heard would not influence his decision. Juror 1, however, stated she thought she might be influenced because "[m]y daughter knows all about it and she's told me." RP at 36. When the court asked if either side wished to be heard or inquire, Mr. Dalluge responded, "I'd like to inquire outside the presence [of the jury]." RP at 37. The judge agreed stating they needed to question the juror "outside the hearing of the rest of the jury" and then suggested they "step into this side room" since the rest of the jury was in the courtroom. RP at 37. The judge, court reporter, attorneys, Mr. Dalluge, his stand-by counsel, and juror 1 then stepped into the side room. The juror realized she was thinking about an incident involving another Mr. Nichols and she promptly returned to the courtroom with the remaining potential jurors.

Later in the voir dire proceedings, juror 27 told the court he believed he would be biased based on his law enforcement experience. The juror asked to speak privately about the matter. Mr. Dalluge voiced no objection or agreement. The parties again stepped into the side room where the juror, a State trooper, stated he knew of Mr. Nichols' criminal background but felt he could be fair and unbiased. The court gave Mr. Dalluge the opportunity to question the juror, but he declined.

On the second day of trial, Mr. Dalluge relinquished his defense to his appointed attorney. The jury found Mr. Dalluge guilty as charged. He appealed.

3

ANALYSIS

The dispositive issue is whether, under these facts, Mr. Dalluge was denied his constitutional right to a public trial.

The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." Similarly, article I, section 22 of the Washington Constitution guarantees, "In criminal prosecutions the accused shall have the right . . . to have a . . . public trial." The Washington Constitution provides in article I, section 10 that "[j]ustice in all cases shall be administered openly." The public trial right is not absolute; it is strictly guarded to assure proceedings occur outside the public courtroom in the most unusual circumstances. *State v. Strode*, 167 Wn.2d 222, 226, 217 P.3d 310 (2009) (citing *State v. Easterling*, 157 Wn.2d 167, 174-75, 137 P.3d 825 (2006)). "Whether a defendant's constitutional right to a public trial has been violated is a question of law, subject to a de novo review on direct appeal." *Strode*, 167 Wn.2d at 225.

Our Supreme Court has articulated guidelines every trial court must follow before closing a courtroom to the public. *State v. Bone-Club*, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995). Those criteria are:

> 1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.
> 2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

4

> 3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
> 4. The court must weigh the competing interests of the proponent of closure and the public.
> 5. The order must be no broader in its application or duration than necessary to serve its purpose.

Bone-Club, 128 Wn.2d at 258-59 (quoting Allied Daily Newspapers v. Eikenberry, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)). But, before a court addresses the *Bone-Club* factors a closure must be contemplated or requested.

Here, we presume a closure was contemplated. *Strode*, 167 Wn.2d at 231. In *Strode*, our Supreme Court held that when a *Bone-Club* analysis is not conducted prior to courtroom closure, prejudice is presumed (i.e. structural error which cannot be considered harmless) and automatic reversal is mandatory. *Id.* But, in *State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009), our Supreme Court noted not all courtroom closures trigger a conclusive presumption of prejudice warranting automatic reversal of convictions. *Id.* at 156. Furthermore, "not every interaction between the court, counsel, and defendants will implicate the right to a public trial, or constitute a closure if closed to the public." *Sublett*, 176 Wn.2d at 71.

In *Momah*, the trial court, on the recommendation of defense counsel, questioned several jurors privately to protect the defendant's right to a fair trial. 167 Wn.2d at 145-46. The court noted, "Due to the publicity of Momah's case, the defense and the trial court had legitimate concerns about biased jurors or those with prior knowledge of Momah's case." *Id.* at 156. The court held that a partial closure of voir dire to

5

safeguard the defendant's right to a fair trial was not a structural error and affirmed the defendant's convictions. *Id.* at 151-52. The *Momah* court noted the requirement of a public trial "is primarily for the benefit of the accused." *Id.* at 148. With this in mind, the court placed significance on the fact that the defendant in that case affirmatively assented to the closure, argued for its expansion, had the opportunity to object but did not, actively participated in the closed proceeding, and benefited from such closure. *Id.* at 151-52. The purpose of the closure, then, was to safeguard the defendant's right to a fair trial by an impartial jury rather than to protect any other interests. *Id.* Accordingly, because the defendant in *Momah* affirmatively accepted and actively participated in the closed hearing, our Supreme Court held that the courtroom closure in that circumstance was "not a structural error" warranting reversal. *Id.* at 156.

In *Wise*, our Supreme Court, citing *Momah*, reiterated that the public trial right can be subordinate to the right to a fair and impartial jury. *Wise*, 176 Wn.2d at 10. The Court distinguished *Momah* from other public trial violation cases on two principal bases: "(1) more than failing to object, the defense affirmatively assented to the closure of voir dire and actively participated in designing the trial closure and (2) though it was not explicit, the trial court in *Momah* effectively considered the *Bone-Club* factors." *Wise*, 176 Wn.2d at 14 (citing *Momah*, 167 Wn.2d at 151-52).

Here, unlike in *Momah*, Mr. Dalluge did not request or endorse the closure the court preemptively outlined before voir dire began. Mr. Dalluge did not affirmatively accept the closed courtroom or actively participate in structuring the closed hearing

process, but merely acceded to the court's direction when asking to question juror 1 outside the presence of the other jurors. Moreover, from this record we cannot conclude the trial court "effectively considered the *Bone-Club* factors." *Wise*, 176 Wn.2d at 14 (citing *Momah*, 167 Wn.2d at 151-52). The remedy is to reverse and remand to allow a new trial.

Reversed.

A majority of the panel has determined this opinion will not be printed n the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Brown, J.

WE CONCUR:

Kulik, J.

Fearing, J.

7