[No. 40333-1-II.   Division Two.   August 8, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. KENNETH LANE SLERT, *Appellant*.

*Jodi R. Backlund* and *Manek R. Mistry* (of *Backlund & Mistry*), for appellant.

*Jonathan L. Myer, Prosecuting Attorney*, and *J. Bradley Meagher* and *Sara I. Beigh, Deputies*, for respondent.

¶1 VAN DEREN, J. — Kenneth Slert appeals his third conviction for second degree murder. Slert argues that the trial court (1) violated Slert's right to a public trial and his right to be present at all critical stages of trial when it held an in-chambers conference solely with counsel that resulted in the dismissal of four prospective jurors;[1] (2) violated his Fifth Amendment[2] privilege against self-incrimination when it admitted Slert's pre-*Miranda*[3] custodial statements, as well as his post-*Miranda* statements, because the State did not "scrupulously honor" his invocation of his right to remain silent; and (3) refused to suppress evidence obtained when the police conducted a warrantless search of Slert's car and campsite and detained him for five hours at the scene of the shooting in the remote woodland area before arresting him. We remand for a new trial based on violation of the public trial right but affirm the trial court's evidentiary rulings should those issues arise on remand.

## FACTS

¶2 We have recited the facts of this case in our previous opinions,[4] thus we repeat only those facts pertinent to the issues Slert raises in this appeal. In the published portion of the opinion, the facts relate only to the dismissal of four jurors following an in-chambers conference between the trial court and counsel without Slert being present. In the unpublished portion, we relate facts pertinent to the issues as we address them.

---

[1] Because we reverse Slert's conviction and remand for a new trial on these issues, we address only the remaining issues raised by Slert that are likely to recur on remand.

[2] U.S. CONST. amend V.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] The State has tried Slert three times for the murder of John Benson, and each time a jury has convicted Slert of second degree murder. We reversed Slert's first conviction, *State v. Slert*, noted at 128 Wn. App. 1069, 2005 WL 1870661, 2005 Wash. App. LEXIS 1972 (*Slert* I), and his second conviction, *State v. Slert*, noted at 149 Wn. App. 1043, 2009 WL 924893, 2009 Wash. App. LEXIS 806 (*Slert* II).

Public Trial Right and Right To Be Present

¶3 Slert argues that the trial court violated both his and the public's right to an open and public trial by excusing four potential jurors in an in-chambers meeting with counsel but without first conducting a courtroom-closure analysis under *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).[5] The State responds that this in-chambers meeting and decisions made during it did not violate the public trial right and did not rise to the level of a courtroom closure requiring a *Bone-Club* analysis because (1) the meeting was not part of voir dire and (2) the meeting was purely ministerial and involved only legal matters and undisputed facts.

¶4 Under the facts of this case and in the absence of any evidence about why the four jurors were dismissed in a nonpublic forum and outside Slert's presence, we hold that the trial court violated Slert's right to a public trial and his right to be present during critical stages of the proceedings.[6]

¶5 At a pretrial hearing on January 6, 2010, in open court and with Slert present, Slert's trial counsel (1) proposed a juror questionnaire that was designed to screen members of the jury pool who had heard about Slert's previous two trials in order to prevent "taint[ing]" the jury pool with a loose comment from a prospective juror and (2)

---

[5] The record does not indicate that the trial court held this in-chambers conference with a court reporter present.

[6] After oral argument in this case, we ordered the parties to address whether the trial court's apparent use of jury questionnaires during the in-chambers meeting, coupled with excusing four jurors and the subsequent sealing of the questionnaires, violated either Slert's or the public's right to open and public trial proceedings. Also, because the parties did not designate the questionnaire or any of the completed questionnaires as part of the record on appeal, we ordered supplementation of the record with the juror questionnaires after oral argument. In response to our order, we learned that the trial court destroyed all of them at some point, apparently without notice to counsel. We also learned that neither counsel had a copy of the questionnaire and that the only copy or draft of the questionnaire remaining was in the trial court's chambers' files.

suggested in-chambers, individual questioning of jurors identified by counsel or the trial court after review of the completed questionnaires. Report of Proceedings (RP) (Jan. 6, 2010) at 4. The trial court stated that it would have the jury pool members fill out the questionnaires on the morning of January 25. Slert did not object to the questionnaire's usage or the court's preliminary discussions about jury selection procedures.

¶6 On January 21, the trial court held another pretrial hearing in Slert's presence and in open court, during which the parties again discussed the juror questionnaire. The State asked that Slert's proposed questionnaire refer to Slert's previous trials as "proceeding[s]" rather than "trial[s]" so that the jury would not know there had been earlier verdicts in his case. RP (Jan. 21, 2010) at 3. Aside from this modification, the State accepted Slert's proposed questionnaire in its entirety. Slert did not object to the word "proceeding[s]" or to the questionnaire's general usage. RP (Jan. 21, 2010) at 3.

¶7 On the morning of January 25, the trial court gave prospective jurors copies of the questionnaire when they arrived for jury selection. The juror questionnaire had questions specific to Slert's case and it dealt with publicity from Slert's earlier trials. The juror questionnaire informed the jurors that (1) they were "under oath," (2) their questionnaire responses were "confidential," (3) the trial court would seal the questionnaires after jury selection, and (4) the questionnaires would "not be available for public inspection or use."[7] Clerk's Papers (CP) at 360.

---

[7] The record is silent regarding when the prospective jurors received the questionnaires on the morning of January 25, from whom the prospective jurors received the questionnaires, and when the trial court swore in the prospective jurors. The transcript of the proceedings states that at 9:30 AM that morning, a panel of prospective jurors was seated in the courtroom and "still going through the questionnaires." RP (Jan. 25, 2010) at 5. Because the jury selection process begins when jurors are sworn and are given questionnaires to complete, such proceedings should be conducted on the record to facilitate appellate review. *See* *State v. Irby*, 170 Wn.2d 874, 884, 246 P.3d 796 (2011).

¶8 Apparently after the prospective jurors filled out and turned in their questionnaire answers, the trial court held a "[p]retrial conference . . . *in chambers*" with counsel[8] shortly before it went on the record on January 25. CP at 194 (emphasis added). Following the in-chambers conference, the trial court indicated on the record that it had previously conferred with both counsel and that the parties had mutually agreed to excuse four jurors from the jury venire based on their questionnaire responses. The trial court stated:

> There are a couple other things. We have . . . the questionnaires that have been filled out. I have *already, based on the [questionnaire] answers, after consultation with counsel, excused jurors* number 19, 36, and 49 from panel two[,] which is our primary panel[,] and I've excused juror number 15 from panel one, the alternate panel.

RP (Jan. 25, 2010) at 5 (emphasis added). Defense counsel indicated that the four jurors had been dismissed because their questionnaire answers had "indicated knowledge of [Slert's] prior court trials." RP (Jan. 25, 2010) at 11. The record is silent about the four dismissed jurors' questionnaire responses or the specific knowledge of the four dismissed jurors. Slert was later present during general voir dire in open court after the trial court administered a verbal oath to the jurors.[9]

A. Standard of Review

■■ ¶9 Whether a violation of the public trial right exists is a question of law we review de novo. *State v.*

---

[8] Reference to the trial court's pretrial conference is the first entry on the clerk's minutes on January 25. At 10:49 AM, the clerk's minutes include a notation that the court was "[i]n session." CP at 194. The minutes subsequently state that (1) the trial court read Slert his rights for trial at this time; (2) Slert acknowledged his rights; (3) panel two jurors 19, 36, 49 and panel one juror 15 were excused "for cause"; and (4) the parties questioned the 15 additional jurors individually in the courtroom. CP at 194.

[9] The admonishment to the jurors before they filled out the questionnaire that they were "under oath" appears to indicate that this was a second oath administered before voir dire began in the open courtroom. CP at 360.

*Momah,* 167 Wn.2d 140, 147, 217 P.3d 321 (2009), *cert. denied,* 131 S. Ct. 160 (2010). A criminal defendant has a right to a public trial under the federal and state constitutions. *State v. Lormor,* 172 Wn.2d 85, 90-91, 257 P.3d 624 (2011). Likewise, the public has a complementary right to open proceedings under the federal and state constitutions. *Lormor,* 172 Wn.2d at 91.

¶10 The public trial right applies to " 'the process of juror selection,' which 'is itself a matter of importance, not simply to the adversaries but to the criminal justice system.' " *In re Pers. Restraint of Orange,* 152 Wn.2d 795, 804, 100 P.3d 291 (2004) (quoting *Press-Enter. Co. v. Superior Court,* 464 U.S. 501, 505, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984)); *see also State v. Bennett,* 168 Wn. App. 197, 204, 275 P.3d 1224 (2012) (public trial right encompasses "circumstances in which the public's mere presence *passively* contributes to the fairness of the proceedings, such as *deterring* deviations from established procedures, reminding the officers of the court of the importance of their functions, and subjecting judges to the check of public scrutiny").

## B. In-Chambers Conference Part of Jury Selection

¶11 The State argues that the January 25 in-chambers conference, before the trial court went on the record, was not a part of jury selection. But, in *State v. Irby,* 170 Wn.2d 874, 246 P.3d 796 (2011), our Supreme Court recently addressed what portions of the proceedings constitute jury selection.

¶12 In *Irby,* prospective jurors filled out a questionnaire that was " 'designed to elicit information with respect to [their] qualifications to sit as a juror in [Irby's] case' " and that expressly reminded the jurors that "filling out the questionnaire was 'part of the jury selection process.' " 170 Wn.2d at 882 (emphasis omitted) (quoting *Irby* Clerk's Papers at 1234). In a subsequent e-mail exchange between the trial court and counsel for both parties, they discussed 10 potential jurors—including 4 potential jurors who had

indicated on their questionnaires that they had parents who had been murdered—and they agreed to dismiss 7 potential jurors for cause. *Irby*, 170 Wn.2d at 878, 884.

¶13 On review, our Supreme Court stated that " 'the work of empaneling the jury' began . . . when jurors were sworn and completed their questionnaires." *Irby*, 170 Wn.2d at 884. The *Irby* court distinguished the e-mail exchange from other types of conferences not implicating a defendant's trial rights because the e-mail exchange "did not simply address the general qualifications of 10 potential jurors, but instead tested their fitness to serve as jurors in [Irby's] particular case." 170 Wn.2d at 882. Accordingly, the court held that the e-mail exchange was a portion of jury selection and that this exchange violated Irby's right under the federal and state constitutions to be present at critical stages of his trial. *Irby*, 170 Wn.2d at 882, 884-85.

¶14 Here, as in *Irby*, the jurors were under oath when they completed the questionnaires and the questionnaires were specific to Slert's case and dealt with publicity from Slert's earlier trials and, thus, were " 'designed to elicit information with respect to [the jurors'] qualifications to sit' " as jurors in Slert's particular case, as opposed to inquiring about the jurors' general qualifications.[10] 170

---

[10] We note that the *Irby* court decided that the questionnaires did not deal merely with the jurors' general qualifications because a defendant's right to be present under the federal constitution attaches to proceedings where the defendant's presence would not " 'be useless, or the benefit but a shadow.' " 170 Wn.2d at 881 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106-07, 54 S. Ct. 330, 78 L. Ed. 674 (1934), *overruled in part on other grounds sub nom. Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)). Thus, a defendant may contribute to his defense during jury selection by giving advice or suggestions to defense counsel or overruling counsel's judgment altogether. *Irby*, 170 Wn.2d at 883.

We recently observed that because the defendant's and public's right to public and open proceedings and the defendant's right to be present function differently, the public's presence may contribute to the fairness of certain proceedings where the defendant's presence may not. *Bennett*, 168 App. at 203-04. Accordingly, courts should exercise caution in applying legal doctrines addressing the public's right to be present to the defendant's public trial right, and vice versa, without regard for the underlying principles requiring the public and/or the defendant to be present during court proceedings. Because the questionnaires in this case fall squarely within *Irby*'s discussion of jury selection, a proceeding to which the defendant's

Wn.2d at 882 (quoting *Irby* Clerk's Papers at 1234). Furthermore, the questionnaires informed the jurors that (1) they were "under oath," (2) their answers to the questionnaires were "confidential," (3) the trial court would seal the questionnaires after jury selection, and (4) the questionnaires would "not be available for public inspection or use"; thus, like the *Irby* questionnaires, filling out the questionnaires in this case was part of jury selection. CP at 360; *Irby*, 170 Wn.2d at 882.

¶15 Accordingly, the record reflects that the prospective jurors filled out questionnaires designed to determine their individual fitness for serving on Slert's particular jury; the trial court then held an in-chambers and off-the-record conference with counsel for both parties; and, when the trial court subsequently went on the record in public, it announced that based on the questionnaire answers and after consulting with counsel, it had already dismissed four potential jurors. Furthermore, the trial court clerk's minutes stated that the four jurors had been dismissed for cause and defense counsel confirmed that the four jurors had been dismissed because their questionnaire answers indicated knowledge of Slert's previous trials. Because the record indicates that this in-chambers conference involved the dismissal[11] of four jurors for case-specific reasons based at least in part on the jury questionnaires, we hold that the in-chambers conference and the dismissal of the jurors were part of the jury selection process to which the public trial right applied.

---

right to be present and the public trial right both apply, we do not reach whether a different public trial right analysis is required. .

[11] We respectfully disagree with the dissent's characterization of the facts surrounding the in-chambers' conference and the jurors' dismissal and the dissent's interpretation of the law applicable to this in-chambers conference. Additionally, the dissent argues that the actual dismissal of the jurors may have occurred during a courtroom side-bar discussion. Dissent at 786 n.26. But if a side-bar conference was used to dismiss jurors, the discussion would have involved dismissal of jurors for case-specific reasons and, thus, was a portion of jury selection held wrongfully outside Slert's and the public's purview.

■ ¶16 We also hold that this in-chambers conference and resulting dismissal of jurors violated Slert's right to be present during critical stages of the proceedings. The record indicates that only the trial judge and counsel were present when the jurors were dismissed, and there is no record showing that defense counsel consulted with Slert before agreeing to the dismissals. *See Irby*, 170 Wn.2d at 884 (stating " 'where . . . personal presence is necessary in point of law, the record must show the fact' " (alteration in original) (quoting *Lewis v. United States*, 146 U.S. 370, 372, 13 S. Ct. 136, 36 L. Ed. 1011 (1892))).

C. *Presley*, *Paumier*, and *Leyerle*

■■ ¶17 We recognize that the public trial right is not absolute and a trial court may close the courtroom under certain circumstances. *Momah*, 167 Wn.2d at 148; *State v. Strode*, 167 Wn.2d 222, 226, 217 P.3d 310 (2009) (plurality opinion). To protect the public trial right and determine whether circumstances warrant a closure, Washington courts must apply the *Bone-Club* guidelines[12] and make specific findings on the record justifying a closure. *Momah*, 167 Wn.2d at 148-49.

¶18 The Washington Supreme Court has held that not all violations of the public trial right result in structural

---

[12] These guidelines are:

"1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a serious and imminent threat to that right.

"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

"3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

"4. The court must weigh the competing interests of the proponent of closure and the public.

"5. The order must be no broader in its application or duration than necessary to serve its purpose."

*Bone-Club*, 128 Wn.2d at 258-59 (alteration in original) (internal quotation marks omitted) (quoting *Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)).

error requiring a new trial. *Momah*, 167 Wn.2d at 149-50. For example, it held in *Momah* that a defendant may make tactical choices to advance his own interests in a fair trial and, thus, in-chambers voir dire violating the public trial right did not require a new trial when the defendant affirmatively assented to, participated in, argued for the expansion of, and benefitted from the in-chambers voir dire. 167 Wn.2d at 153, 155-56.

¶19 But, as we have previously held, the United States Supreme Court's decision applying the federal constitution in *Presley v. Georgia*, 558 U.S. 209, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010), sub silentio overruled our state Supreme Court's decision in *Momah* and "resolve[d] any question about what a trial court must do before excluding the public from trial proceedings, including voir dire." *State v. Paumier*, 155 Wn. App. 673, 685, 230 P.3d 212, *review granted*, 169 Wn.2d 1017 (2010); *see also State v. Leyerle*, 158 Wn. App. 474, 482, 486, 242 P.3d 921 (2010) (stating the same). Under our reading of *Presley*, "where the trial court fails to sua sponte consider reasonable alternatives [to closure] and fails to make the appropriate findings, the proper remedy is reversal of the defendant's conviction." *Paumier*, 155 Wn. App. at 685 (citing *Presley*, 558 U.S. at 215); *see also Leyerle*, 158 Wn. App. at 481 (stating the same).

¶20 Here, the trial court excluded the public from trial proceedings by holding a portion of jury selection in chambers, not in public. Because it failed sua sponte to consider reasonable alternatives to closure and failed to make appropriate findings supporting the closure, the closure violated Slert's public trial rights and we reverse and remand for a new trial.

### D. *Momah* and *Strode*

¶21 Although we adhere to our decisions in *Paumier* and *Leyerle*, in light of our Supreme Court's grant of review in *Paumier*, we also address Slert's public trial right claim

under *Momah* and *Strode*, two decisions our Supreme Court issued the same day. We resolve this case on the issue of Slert's right to a public trial, not the public's right to the same. *Accord State v. Bowen*, 157 Wn. App. 821, 831, 239 P.3d 1114 (2010).

¶22 In *Momah*, our Supreme Court observed that unlike in previous public trial right cases, the trial court had, in some form, recognized and balanced Momah's right to a public trial and his right to an impartial jury. 167 Wn.2d at 151-52; *see also Strode*, 167 Wn.2d at 233 (Fairhurst, J., concurring) (the record in *Momah* showed that the parties and the trial court knew that all proceedings were presumptively open and public).[13]

¶23 The court also observed that Momah had affirmatively assented to, participated in, argued for the expansion of, and benefitted from in-chambers voir dire. *Momah*, 167 Wn.2d at 155; *see also Strode*, 167 Wn.2d at 234 (Fairhurst, J., concurring) (the record in *Momah* showed an intentional waiver by the defendant of his public trial right). Finally, the record showed that the trial court and counsel discussed possible locations for the individual juror questioning, and the jury pool's size and room availability played a part in choosing to conduct individual juror questioning in chambers. *Strode*, 167 Wn.2d at 232 (Fairhurst, J., concurring). Thus, in *Momah*, our Supreme Court held that the closure was not a structural error requiring reversal and remand for a new trial. 167 Wn.2d at 156.

---

[13] As we observed in *Bowen*, 157 Wn. App. at 831 n.6:

In *Momah*, our Supreme Court rejected the defendant's public trial right arguments that in-chambers voir dire of some jurors required reversal of his conviction and remand for a new trial. *Momah*, 167 Wn.2d at 156. In *Strode*, a plurality of the court reversed another defendant's conviction on the same in-chambers voir dire issue. 167 Wn.2d at 231. In *Strode*'s concurring opinion, two justices of the court agreed with the plurality opinion result on different grounds. *Strode*, 167 Wn.2d at 236. In doing so, it identified additional facts in *Momah* that distinguished that case from *Strode*. *Strode*, 167 Wn.2d at 232-34 (Fairhurst, J., concurring). Thus, we cite to *Strode* for these facts in our discussion of *Momah*.

¶24 In contrast, "the record in *Strode* contained no indication that the trial court held a *Bone-Club* hearing, considered the defendant's right to a public trial, or balanced this right with competing interests before closing the courtroom." *Bowen*, 157 Wn. App. at 832 (citing *Strode*, 167 Wn.2d at 224 (plurality opinion), 235 (Fairhurst, J., concurring)).

¶25 Applying these principles in *Bowen*, we reasoned:

[T]he circumstances in this case are more similar to those in *Strode* than those in *Momah*. Here, the trial court, not defense counsel, proposed individual in-chambers voir dire of jury pool members. Likewise, defense counsel did not actively participate in the in-chambers voir dire; the trial court judge asked all the questions and asked the attorneys only whether they wanted to inquire further or objected to the excusal of jurors. Furthermore, the record does not indicate circumstances requiring individual questioning of jurors in chambers, as opposed to another public location. Finally, although the record shows that the trial court considered Bowen's right to an impartial jury, it contains no indication that either it or the parties considered his right to a public trial or explained that right to him. *See Momah*, 167 Wn.2d at 152 (defendant's right to impartial jury and right to public trial are distinct from each other). Therefore, we cannot conclude that the trial court adequately safeguarded his public trial right or that he made deliberate, tactical choices precluding him from relief.

157 Wn. App. at 832-33. Accordingly, we held that the closure in *Bowen* constituted structural error requiring reversal and remand for a new trial. 157 Wn. App. at 833.

¶26 We conclude that the closure in this case is more similar to those in *Strode* and *Bowen* than the closure in *Momah*. Here, the record contains no indication that Slert's counsel proposed the in-chambers portion of jury selection, only that he participated in it. The record contains no indication that circumstances required that this conference occur in chambers or that the trial court considered reasonable, public alternatives. Finally, the record contains no

indication that either the trial court or the parties considered Slert's public trial right or explained that right to him before agreeing to the dismissal of the four jurors. Accordingly, under *Strode* and *Bowen*, we hold that the closure in Slert's case was structural error and requires reversal and remand for a new trial.[14]

¶27 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, A.C.J., concurs.

¶28 HUNT, J. (dissenting) — I respectfully dissent from the majority's reversal of Slert's conviction and its remand for a fourth trial, which, in my view, the record before us does not support. More specifically, I disagree with the majority's (1) assumption that the trial court's pretrial consultation with counsel in chambers produced its later excusal of four jurors on the record, (2) holding that such consultation constituted "part of the jury selection process

---

[14] Slert also argues that the trial court's sealing and subsequent destruction of the jury questionnaires violated both his right to a public trial and the public's right to open proceedings under the state constitution. Because we reverse based on the in-chambers conference, we do not reach this issue. But, we note that the subsequent sealing of juror questionnaires used during in-chambers jury selection proceedings likely constitutes a closure implicating the defendant's public trial right and the public's right to open proceedings. *See State v. Smith*, 162 Wn. App. 833, 847-48, 262 P.3d 72 (2011) (stating that no closure requiring a *Bone-Club* analysis occurs when the defendant uses the " 'content of the questionnaires' to question jurors 'in open court, where the public could observe' " (quoting *In re Pers. Restraint of Stockwell*, 160 Wn. App. 172, 183, 248 P.3d 576 (2011) (Van Deren, J., concurring), *mot. for discretionary review filed*, No. 85669-9 (Wash. Mar. 2, 2011))), *review denied*, 173 Wn.2d 1007 (2012).

More importantly, the trial court's ultimate destruction of the questionnaires eliminated our ability to ascertain their content and, thus, the nature of the matters discussed during the in-chambers conference. By far the better practice is to preserve questionnaires to facilitate potential appellate review.

to which the public trial right applied,"[15] and (3) conclusion that the trial court's putting four jurors' excusals on the record in open court in Slert's presence did not preserve Slert's public trial right.

¶29 I would hold that (1) the trial court's pre-voir-dire excusal of four jurors was purely "administrative" or "ministerial," not part of "voir dire" required to be conducted in open court; or, (2) alternatively, even if the four jurors' excusals were part of the jury selection process required to be conducted in open court, the excusals were sufficiently announced in open court in Slert's presence and they were not structural error warranting reversal and retrial. I would affirm.

FACTS

I. PRETRIAL COMPONENTS OF JURY SELECTION PROCESS

A. Pretrial Hearings in Open Court, January 6 and 21

¶30 As the majority notes, on January 6 and 21, 2010, the trial court conducted pretrial hearings in Slert's presence in open court, during which the parties discussed the nature and content of the jury questionnaires and general voir dire procedures for Slert's trial. Slert drafted and proposed a jury questionnaire designed to identify venire members who had heard about his highly publicized previous trials, both of which had resulted in convictions for the same crime for which he was again being retried. The State agreed to Slert's jury questionnaire, with one proposed edit: The State asked the trial court to refer to Slert's prior trials as "proceedings" so the prospective jurors would not know that Slert had been previously convicted. Verbatim Report of Proceedings (VRP) (Jan. 21, 2010) at 4.

---

[15] Majority at 774.

¶31 To avoid "taint[ing]"[16] the rest of the jury pool, Slert suggested conducting in-chambers voir dire of individuals whose juror questionnaire responses indicated knowledge about Slert's prior convictions; the trial court neither granted nor denied Slert's request at this time.[17] Slert, represented by counsel, was present for both pretrial hearings and voiced no objections.

## B. Pretrial Conference in Chambers and in Open Court, January 25

¶32 A few days after the January 21 pretrial hearing, the trial court apparently held a pretrial conference in chambers. The trial court clerk's minute entry for January 25 states, "Pretrial conference was held in chambers." Clerk's Papers (CP) at 194. This minute entry does *not*, however, note what was discussed during this pretrial conference. Nor, contrary to the majority's assumption, do these minute entries say that this pretrial conference in chambers resulted in the excusal of the four jurors based on their answers to the questionnaires.

¶33 The next minute entries, apparently reflecting proceedings in open court when court was "[i]n session," state: (1) "Witnesses excluded except for the chief investigating officer"; (2) "[c]ourt gave the defendant his rights for trial"; and (3) "[t]he defendant acknowledged understanding his rights." CP at 194. These minute entries parallel the verbatim report of proceedings recounting of the sequence of events; and both indicate that Slert was present throughout. Similarly, these minute entries do not mention that four jurors were excused during the earlier pretrial conference in chambers.

---

[16] VRP (Jan. 6, 2010) at 4.

[17] Instead, the trial court stated that the jurors would receive and complete their questionnaires the first day of trial, set for January 25.

## C. Pre-Voir-Dire Administrative Excusal of Four Jurors, January 25

¶34 Slert remained present in open court when, before the venire was brought into the courtroom,[18] the trial court announced on the record that, "after consultation with counsel" and as "agreed by counsel," it had "excused" four jurors "for cause" "based on [their] answers" to the questionnaires, three from the "primary panel" and one from the "alternate panel." VRP (Jan. 25, 2010) at 5; CP at 194. Again, Slert voiced no objection.

¶35 Neither the clerk's minute entries nor the verbatim report of proceedings state where or when this "consultation with counsel"[19] had taken place, whether it had involved any interactive juror questioning, or whether Slert had or had not been present or had offered personal input in addition to his counsel's participation. Yet the majority *assumes* (1) as a matter of law, that the trial court's earlier in-chambers conference, noted in the clerk's minute entry as having occurred before court was "[i]n session,"[20] was "part of the jury selection process to which the public trial right applied"[21]; and (2) as a matter of fact, that the trial court excused the four jurors in chambers rather than in open court. The record does not support this latter factual assumption; therefore, the former legal assumption is not supportable. *State v. Madarash*, 116 Wn. App. 500, 509, 66 P.3d 682 (2003).

¶36 As I describe later, the right to a public trial has generally encompassed only "voir dire" and other interac-

---

[18] The following parts of the record suggest that the jury was not yet in the courtroom: (1) the trial court's statement before these pretrial discussions, "[W]hen the jury panel comes in . . . ," and (2) Slert's counsel's later suggestion that the trial court "bring the panel in." VRP (Jan. 25, 2010) at 4, 11.

[19] VRP (Jan. 25, 2010) at 5.

[20] CP at 194.

[21] Majority at 774.

tive and adversarial aspects of jury selection. Here, however, the record does not reflect that any individual juror questioning occurred in chambers, despite Slert's request for such procedure; on the contrary, the record strongly suggests that *no individual juror questioning occurred in chambers*. First, as I previously noted, the verbatim report of proceedings does not mention any in-chambers jury voir dire; and the clerk's minute entry mentions only a "[p]retrial *conference* . . . in chambers," with no corresponding mention of the subject discussed or action taken. CP at 194 (emphasis added). More specifically, this minute entry says nothing about jurors in general or excusing four jurors in particular during this in-chambers conference.

¶37 Second, both the verbatim report of proceedings and the minute entries reflect only that, *after* court was in open public session, the trial court stated on the record that, with both counsel's agreement, it had excused four jurors based on their questionnaire responses; neither the verbatim report of proceedings nor the minute entries recite a location where this agreement between the trial court and counsel had occurred.[22] Furthermore, neither the clerk's minute entries nor the verbatim report of proceedings link

---

[22] Although the trial court clerk's minute entry states that the four jurors were excused "for cause" and the verbatim reports of proceedings suggests that the excusals were based on the jurors' questionnaire responses, neither the minute entry nor the related verbatim reports of proceedings explains what type of "cause" these excusals entailed. CP at 194. Excusal could have been for reasons unrelated to the specifics of Slert's trial because, when the court session began shortly thereafter, (1) Slert reminded the trial court that they had not yet dealt with 15 potential jurors whose questionnaires indicated knowledge about pretrial publicity covering his case; and (2) the trial court unequivocally vetoed Slert's suggestion that they voir dire these 15 jurors individually in chambers. This colloquy strongly suggests that (1) the trial court did not and would not engage in voir dire in chambers; and (2) the trial court's previous "consultation with counsel," after which with their consent it had "excused" four jurors, had *not* involved such objectionable off-the-record in-chambers voir dire. VRP (Jan. 25, 2010) at 5.

I agree with the majority that counsel and the trial court *likely* excused the four jurors for cause because, according to Slert's counsel's comments on the record, their juror questionnaire answers had "indicated knowledge of [Slert's] prior court trials." VRP (Jan. 25, 2010) at 11. But I disagree with the majority's transforming this likelihood into a certainty on the silent record before us. Despite this *hint*, the record does not definitively show the actual cause for excusing these four jurors;

this excusal of four jurors with the "[p]retrial conference in chambers"[23] or even hint that the excusal of the four jurors was the product of interactive voir dire questioning. On the contrary, the record strongly suggests that these four jurors' excusals were based solely on their passive responses to the questionnaire that Slert had designed to identify potential jurors tainted by pretrial publicity.

¶38 That neither the trial court nor counsel had yet questioned any prospective jurors about their questionnaire responses is also a reasonable inference from Slert's counsel's later comments on the record and the trial court's response. After the trial court announced on the record that it had excused the four jurors after consulting with counsel, Slert reiterated his pretrial suggestion that the parties question 15 venire members away from the other jurors, "in chambers,"[24] because they might have known something about Slert's case. Despite the 15 jurors' questionnaires apparently having indicated knowledge of Slert's pretrial publicity, the trial court flatly refused individual juror in-chambers questioning and clearly explained that individual questioning of these jurors would occur in open court.[25]

---

nor does the record clearly show that these four excusals were the result of out-of-court voir dire. In short, this incomplete record on appeal does not justify reversal and retrial based on speculation that the steps counsel and the trial court took to provide Slert with a fair and impartial jury *might* have violated his rights.

[23] CP at 194.

[24] VRP (Jan. 25, 2010) at 11.

[25] VRP (Jan. 25, 2010) at 10-12 reflects the following colloquoy:

[SLERT:] *[W]e still haven't dealt with the responses to the questionnaire.*

And what I would like to do, I've got a list of *15 jurors* that responded that they knew something about the case based on publicity. . . . *I would want to have those 15 interviewed in chambers individually.*

. . . .

And I would—because of the situation we're in now, I would suggest we . . . bring the panel in, start with number three and start calling them in [for questioning]. We can probably do it in here [in the court] rather than doing it in chambers.

[COURT:] Yeah. *We're not doing it in chambers.*

. . . .

## II. Voir Dire in Open Court

¶39 Before voir dire began, the trial court took special care to be sure that Slert, who used a hearing assistance device, could hear the juror questioning. The trial court also inquired to ascertain whether the guards' inadvertent bringing Slert into an unused courtroom where the alternate jurors had been filling out their questionnaires had adversely influenced them.

¶40 Having refused Slert's request for in-chambers voir dire, the trial brought the 15 potentially tainted venire members into the courtroom individually, swore them in, and allowed counsel to conduct voir dire in Slert's presence on the record in open court. This voir dire consumed much of the day and filled 55 pages of the verbatim report of proceedings. Later, the trial court brought the remaining venire of some 40 jurors into court, swore them under oath, and began general voir dire, again in Slert's presence in open court. At no time did Slert or anyone else object to this process.

## ANALYSIS

### I. Voir Dire Part of, not Coextensive with, Jury Selection

#### A. *Irby*

¶41 Relying on *State v. Irby*, 170 Wn.2d 874, 246 P.3d 796 (2011), the majority summarily concludes, "[T]he *in-chambers conference* and the dismissal of the jurors were part of the jury selection process to which the public trial right applied." Majority at 774 (emphasis added). With all due respect, the record does not support (1) that the ambiguous

---

[COURT:] [W]e'll go through this process where we will bring the jurors in [to the court] individually and ask them some follow-up questions about the questionnaire [responses].

(Emphasis added.)

"in-chambers conference" was "part of the jury selection process to which the public trial right applied"; or (2) that the trial court's "consultation with counsel," which the majority concludes precipitated the four jurors' excusal, occurred in chambers.[26] VRP (Jan. 25, 2010) at 5. Regardless of where this consultation occurred, the salient point is that the trial court put the excusal of the four jurors on the record in open court in Slert's presence; and Slert neither objected nor asked for details.

¶42 In contrast with the majority's assumption, a reasonable inference drawn from the trial court's adamant refusal of Slert's express request to question individual jurors in chambers is that the earlier "in-chambers conference"[27] did not involve juror "voir dire." Therefore, this "in-chambers conference," which did not clearly involve juror questioning or the eventual excusal based on the four jurors' answers to the questionnaires, was *not* part of the jury selection process to which the public trial right applied.[28]

---

[26] Nor does the record explain whether this consultation was a side-bar conference in open court or at some other location.

[27] Majority at 774.

[28] I agree with the majority's admonition about refraining from conflating a defendant's right to be present and his and the public's rights to a public trial. Nevertheless, *Irby*'s actual holding does not apply here. Irby argued in Division One of our court that the trial court's e-mail exchange with counsel about juror selection and questionnaires violated his right to be present *and* his right to a public trial under the state and federal constitutions; but Division One of our court based reversal of his conviction on only one of these two arguments, namely violation of only his right to be present at that stage of the proceedings in that case. *Irby*, 170 Wn.2d at 879. Thus, Irby's earlier asserted public-trial-right argument was not before the Supreme Court.

Although *Irby* discusses the use of juror questionnaires and the portion of jury selection for which a defendant has a due process right to be present, *Irby* does not involve *any* discussion about a defendant's right to a public trial. *See Irby*, 170 Wn.2d at 880-84. Furthermore, unlike the known facts here, the record in *Irby* more clearly showed that Irby had not been present for or privy to counsel's and the court's e-mail exchange about juror selection and questionnaires.

### B. "Voir Dire" Not Coextensive with "Jury Selection"

¶43 Some cases use the terms "jury selection" and "voir dire" interchangeably when addressing the parts of the process that must occur in open court. But there are significant differences between the entire "jury selection" process from beginning to end, which includes administrative processes and the critical "voir dire" *component*, which focuses on seeking information from individual jurors as part of the adversarial process.

¶44 Dissenting in *Irby*, Chief Justice Madsen explains the early administrative stages of jury selection as follows:

> In our state, as in other jurisdictions, jury selection begins with a general screening process that eliminates from jury service those who do not meet statutory qualifications. RCW 2.36.070 sets forth basic jury qualifications, which include that the individual is at least 18 years old, a citizen of the United States, a resident of the county in which he or she is to serve, able to communicate in English, and the individual has not been convicted of a felony or not had civil rights restored. Other reasons for excusal are within the trial court's discretion.

*Irby*, 170 Wn.2d at 889-890 (Madsen, C.J., dissenting). Similarly, RCW 2.36.100(1) and (3) give the trial court authority to excuse potential jurors for "undue hardship, extreme inconvenience, public necessity, prior jury service at least twice in the preceding twelve months," or for " '*any reason* deemed sufficient by the court.' " *Irby*, 170 Wn.2d at 890 (some emphasis omitted) (quoting RCW 2.36.100(1), (3)). As Chief Justice Madsen further notes:

> This law . . . "vests . . . a *wide discretion* to be exercised in the matter of excusing persons summoned for jury service from the performance of that duty." *State v. Ingels*, 4 Wn.2d 676, 682-83, 104 P.2d 944 (1940) (emphasis added); *accord State v. Rice*, 120 Wn.2d 549, 562, 844 P.2d 416 (1993); *see State v. Roberts*, 142 Wn.2d 471, 518-19, 14 P.3d 713 (2000) (a trial court's decision to excuse members of the jury venire is reviewed under an abuse of discretion standard).

*Irby*, 170 Wn.2d at 890 (second alteration in original).

¶45 The reasons for which a trial court may excuse potential jurors administratively are generally nondebatable reasons that bear no relationship to the defendant's case and, therefore, do not generally warrant an adversarial setting in open court. *See Irby*, 170 Wn.2d at 887-88, 890. Thus, a defendant's right to a public trial does not extend to "purely *ministerial* or *legal issues* that do not require the resolution of disputed facts." *State v. Sadler*, 147 Wn. App. 97, 114, 193 P.3d 1108 (2008) (emphasis added). In contrast to pretrial administrative excusals at the trial court's discretion, the voir dire portion of the jury selection process is a distinctly adversarial process in which both counsel and the trial court may *actively question* prospective jurors, elicit direct responses, and "scrutinize not only [the jurors'] spoken words but also [their] gestures and attitudes" to ensure that the defendant receives an impartial jury. *Gomez v. United States*, 490 U.S. 858, 875, 109 S. Ct. 2237, 104 L. Ed. 2d 923 (1989).

C. Other Case Law on Public Trial Rights; Inadequate Record Here

¶46 Washington courts have repeatedly recognized that a defendant's "public trial right applies to the evidentiary phases of the trial, *and to other 'adversary proceedings,'*" including voir dire. *State v. Rivera*, 108 Wn. App. 645, 652-53, 32 P.3d 292 (2001) (emphasis added) (quoting *Ayala v. Speckard*, 131 F.3d 62, 69 (2d Cir. 1997)). Thus, most Washington cases finding violations of a defendant's public trial right in relation to jury selection have involved clear public exclusion from actual juror questioning.[29]

---

[29] *See, e.g., State v. Leyerle*, 158 Wn. App. 474, 242 P.3d 921 (2010) (voir dire of juror in court hallway violated public trial right); *State v. Paumier*, 155 Wn. App. 673, 230 P.3d 212 (individual voir dire of jurors in chambers violated public trial right), *review granted*, 169 Wn.2d 1017 (2010); *State v. Bowen*, 157 Wn. App. 821, 239 P.3d 1114 (2010) (same); *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009) (same); *State v. Erickson*, 146 Wn. App. 200, 189 P.3d 245 (2008) (individual voir

¶47 Slert's inconclusive record suggests that the trial court may have administratively excused four jurors based *solely* on their passive written responses to juror questionnaires, not in response to interactive juror voir dire questioning. There is no clear indication in the record (1) that any " 'adversary proceedings' "[30] occurred during either the pretrial conference "in chambers"[31] or the trial court's "consultation with counsel"[32] during which counsel agreed to excuse the four prospective jurors; or (2) that the trial court and counsel conducted any voir dire of these four jurors before excusing them (highly unlikely in light of the trial court's flat refusal of Slert's request to voir dire individually in chambers 15 jurors whose questionnaires indicated knowledge of pretrial publicity).

¶48 In *Bennett*, we declined to find a violation of the defendant's public trial rights based on an inadequate record.[33] The record reflected that the parties had an "in-chambers conference about jury instructions"; but it did not elaborate beyond the trial court's later on-the-record statement that the court and counsel " 'had an opportunity

---

dire of jurors in jury room violated public trial right); *State v. Duckett*, 141 Wn. App. 797, 173 P.3d 948 (2007) (same); *State v. Brightman*, 155 Wn.2d 506, 122 P.3d 150 (2005) (public trial right violated when entire voir dire closed to all spectators); *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 100 P.3d 291 (2004) (same). *But see State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009) (individual voir dire in chambers was not "structural error" and did not violate public trial right), *cert. denied*, 131 S. Ct. 160 (2010).

In addition, the United States Supreme Court considered only whether the defendant's Sixth Amendment right to a public trial applied to "the *voir dire* of prospective jurors." *Presley v. Georgia*, 558 U.S. 209, 130 S. Ct. 721, 723, 175 L. Ed. 2d 675 (2010).

[30] *Rivera*, 108 Wn. App. at 652 (quoting *Ayala*, 131 F.3d at 69).

[31] CP at 194.

[32] VRP (Jan. 25, 2010) at 5.

[33] As we noted in *State v. Bennett*, 168 Wn. App. 197, 206, 275 P.3d 1224 (2012):

In order to obtain effective review of an in-chambers conference, the parties should make an adequate record in the trial court about what transpired during any conference so we can determine whether the conference dealt with purely ministerial issues or involved discussion or resolution of disputed facts or legal issues.

to go over the instructions' and that the instructions had 'been copied and collated.' " *Bennett*, 168 Wn. App. at 205. Based on this record, which I note was more specific than the one we have here, we surmised that the "in-chambers conference" could have involved "purely ministerial or administrative matters" or it could have involved discussions about evidence or disputed facts related to the jury instructions; nevertheless, we rejected Bennett's suggestion that we *infer* that nonministerial matters were discussed. *Bennett*, 168 Wn. App. at 206. Although *Bennett* did not involve excusal of potential jurors, the rationale pertains here, namely, that (1) we cannot base appellate decisions on conjecture about what may have occurred during discussions for which we have no clear record; and (2) we should not infer that nonministerial matters were discussed where the record does not clearly show this happened.

¶49 Here, the record before us does not show whether the trial court's "in-chambers conference" involved "purely ministerial or administrative matters," any juror excusals at all (whether under RCW 2.36.100(1) or for other reasons), or discussions about disputed facts related to the four later-announced excused jurors' fitness to serve that should have occurred during in-court voir dire.[34] *See Bennett*, 168 Wn. App at 206. As in *Bennett*, the nonspecific clerk's minute entries for Slert's trial do not justify surmising that *any* matters implicating Slert's public trial right, including voir dire, occurred during the pretrial conference in chambers. On the contrary, as previously noted, the Slert trial court's unequivocal refusal to question any individual jurors in chambers justifies our surmising instead that the

---

[34] As previously explained, the clerk's minute entries comprised only two short, but separate and unrelated, notations, the first reporting that the trial court held a "[p]retrial conference . . . in chambers" and the second (following several lines describing advising Slert about his trial rights) reporting that four jurors "were excused for cause and agreed by counsel." CP at 194. This second entry however, did not mention where or when this juror excusal occurred; more importantly, it does *not* state that the excusal occurred during the earlier reported "conference . . . in chambers." CP at 194.

pretrial conference in chambers did not include "any [such] issues, factual or legal." *Bennett*, 168 Wn. App at 206.[35]

## II. No Reversal Required under *Momah*[36] or *Paumier*[37]

¶50 Even if the trial court's pretrial excusal of four jurors constituted a courtroom closure that denied Slert's right to a public trial, I disagree with the majority that the closure was a "structural error" requiring reversal of Slert's conviction. Majority at 779. Article I, section 22 of the state constitution guarantees a criminal defendant a " '*public* trial by an *impartial* jury.' " *Momah*, 167 Wn.2d at 152 (first emphasis added) (quoting Wash. Const. art. I, § 22). The right to public trial and the right to an impartial jury are interrelated but distinct. *Momah*, 167 Wn.2d at 152. If these two rights come into conflict, we must "harmonize" them and construe them "in light of the central aim of a criminal proceeding: *to try the accused fairly.*" *Momah*, 167 Wn.2d at 152-53 (emphasis added).

¶51 A defendant is entitled to a fair, not a perfect, trial. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984). And because the public trial right is "primarily for the benefit of the accused," we "permit the accused to make tactical choices to advance his own interests" and to achieve what *he perceives* as the fairest result for his trial. *Momah*, 167 Wn.2d at 148,

---

[35] The majority notes that the record does not show whether Slert was present during the in-chambers conference or that his counsel had consulted with him before later agreeing with the trial court to excuse the four jurors. The majority here asserts, " '[W]here . . . personal presence is necessary in point of law, *the record must show the fact*' " to support its conclusion that the "in-chambers conference and resulting dismissal of jurors violated Slert's right to be present during critical stages of the proceedings." Majority at 775 (emphasis added) (alteration in original) (internal quotation marks omitted) (quoting *Irby*, 170 Wn.2d at 884). This conclusion is at odds with our holding in *Bennett* that we will not infer from an inadequate record that a defendant's rights were violated, 168 Wn. App. at 206-07.

[36] *State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009), *cert. denied*, 131 S. Ct. 160 (2010).

[37] *State v. Paumier*, 155 Wn. App. 673, 230 P.3d 212, *review granted*, 169 Wn.2d 1017 (2010).

153. Some early public-trial case law broadly stated that "[p]rejudice is presumed" and that an appellate court must automatically "remand for a new trial"[38] anytime a trial court fails to apply the *Bone-Club* factors before closing the courtroom. *State v. Bone-Club*, 128 Wn.2d 254, 261-62, 906 P.2d 325 (1995) (citing *State v. Marsh*, 126 Wash. 142, 146-47, 217 P. 705 (1923)). But this bright line rule calling for automatic reversal no longer applies.

## A. *Momah*

¶52 Three years ago, a majority of our Supreme Court recognized that not all courtroom closures are "fundamentally unfair," that automatic reversal of a conviction is not required unless the courtroom closure was a "structural" error, and that the appellate court should "devise[ ] a remedy appropriate to [the] violation" for nonstructural errors. *Momah*, 167 Wn.2d at 149. An error is "structural" when it " 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' " *Momah*, 167 Wn.2d at 149 (alteration in original) (internal quotation marks omitted) (quoting *Washington v. Recuenco*, 548 U.S. 212, 218-19, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)). Conversely, then, an error would not be structural, warranting reversal and a new trial, if it did *not* " 'necessarily render[ ] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' " *Momah*, 167 Wn.2d at 149 (alteration in original) (internal quotation marks omitted) (quoting *Recuenco*, 548 U.S. at 218-19). Our Supreme Court held that conducting individual juror voir dire in chambers did not constitute structural error where the defendant had "affirmatively accepted the closure, argued for the expansion of it, actively participated in it, and sought [the] benefit from it." *Momah*, 167 Wn.2d at 156.

¶53 I strongly disagree with the majority's conclusion that *Momah* does not control any courtroom closure that

---

[38] *Orange*, 152 Wn.2d at 814.

they surmise might have occurred here; and their reliance on the plurality decision in *Strode*[39] is misplaced.[40] On the contrary, even if the *Strode* facts aligned with Slert's, the *Strode* plurality decision would provide no precedent controlling our decision here.[41] Instead, we are bound by the majority decision in *Momah*, which, as noted above, requires a "remedy appropriate to [the ]violation,"[42] not automatic reversal. Following *Momah*, I fail to see how the process that the trial court followed below denied Slert a fair trial or prejudiced him in any way. On the contrary, the record clearly shows that all parties involved undertook extra cautionary measures to assure that Slert had an impartial jury and a fair trial, following Slert's "tactical choices to advance his own interests" and to achieve what *he perceived* as the fairest result for his trial.[43] *Momah*, 167

---

[39] *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009) (plurality opinion).

[40] Our Supreme Court reached a different result in *Strode*, a plurality opinion issued the same day as *Momah*. In *Strode*, the trial court and counsel had conducted individual voir dire of 11 prospective jurors in chambers to ensure "confidentiality" and that the jurors' responses to a juror questionnaire (asking intimate details about the jurors' exposure to sexual abuse) would not be " 'broadcast' " in front of the whole jury panel. *Strode*, 167 Wn.2d at 224. Under those facts, the plurality concluded that conducting voir dire in chambers was (1) a courtroom closure that violated Strode's right to a public trial, and (2) structural error, because "the record [did] not show that the court considered the [defendant's] right to a public trial" or that it balanced this public trial right "in light of [Strode's] competing interests" in having an impartial jury. *Strode*, 167 Wn.2d at 235 (Fairhurst, J., concurring).

I respectfully disagree with the majority's conclusion that Slert's facts are more similar to the *plurality* decision in *Strode* than to the *majority* decision in *Momah*. Strode's record was "devoid" of any showing that the trial court had considered *his* public trial interests—as opposed the *jurors'* confidentiality interests—before it conducted voir dire in chambers. *Strode*, 167 Wn.2d at 228. Here, in contrast, the record indicates that the trial court *did* consider Slert's public trial right when it flatly refused his request to voir dire in chambers 15 potentially prejudiced jurors.

[41] *See State v. Zakel*, 61 Wn. App. 805, 808-09, 812 P.2d 512 (1991), *aff'd*, 119 Wn.2d 563, 834 P.2d 1046 (1992); *see also Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977).

[42] *Momah*, 167 Wn.2d at 149.

[43] Here, as in *Momah*, the trial court and both counsel exhibited a common concern for balancing and safeguarding Slert's right to a public trial and his right to an impartial jury. Slert's counsel originally proposed a juror questionnaire designed to reveal jurors who knew information about Slert's previous trials to

Wn.2d at 148, 153. I would hold that Slert's case falls within the parameters of *Momah* and that any courtroom closure that may have occurred was not structural and, thus, does not require reversal of his conviction and another retrial.

### B. *Paumier*

¶54 I also cannot agree with the majority's reliance on our split panel's conclusion in *Paumier* that the United States Supreme Court's decision in *Presley v. Georgia*, 558 U.S. 209, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010), "sub silentio" overruled our State Supreme Court's decision in *Momah* such that automatic reversal is required whenever a " 'trial court fails to sua sponte consider reasonable alternatives [to closure] and fails to make the appropriate findings.' " Majority at 776 (quoting *Paumier*, 155 Wn. App. at 685 (citing *Presley*, 558 U.S. at 215)). As both Judge Quinn-Brintnall and I have previously noted in dissents, *Presley* did not have such a far-reaching holding. *Paumier*, 155 Wn. App. at 688-90 (Quinn-Brintnall, J., dissenting);

---

avoid "taint[ing]" the rest of the jury pool; the State assented without protest, suggesting one small edit in the questionnaire wording to further this goal. VRP (Jan. 6, 2010) at 4.

The record does not show who proposed the pretrial in-chambers conference or that the excusal of four jurors resulted from this in-chambers conference. But assuming, without agreeing as the majority asserts, that it was this pretrial conference that resulted in excusing the four jurors, the record shows that Slert's counsel "actively participated," based on the trial court's later statement on the record that it had excused four jurors "after consultation *with counsel*." VRP (Jan. 25, 2010) at 5 (emphasis added). The record also shows that Slert was present when the trial court made this announcement on the record in open court and that he did not object, thus, tacitly, at least, approving these juror excusals.

Further assuming, without agreeing with the majority, that the trial court's · "consultation with counsel" was a courtroom closure, Slert twice advocated an even more "expansive" "courtroom closure" when he asked the trial court to conduct individual voir dire in chambers of 15 prospective jurors with knowledge of his prior trials to keep them from tainting the rest of the venire. *See* VRP (Jan. 6, 2010) at 3-4; VRP (Jan. 25, 2010) at 11. The trial court promptly rejected this latter proposal, stating, "[W]e're *not* doing [voir dire] in chambers." VRP (Jan. 25, 2010) at 12 (emphasis added). Again, this unequivocal refusal to allow juror voir dire in chambers, despite its potential efficacy for avoiding tainting the venire, is strong evidence that the trial court did not allow any in-chambers voir dire in Slert's trial, that it excused the four jurors for administrative or ministerial reasons pretrial and pre-voir-dire, and that the trial court fully recognized and balanced Slert's public trial rights with his right to an impartial jury.

*State v. Leyerle*, 158 Wn. App. 474, 490, 242 P.3d 921 (2010) (Hunt, J., dissenting). The trial court excluded Presley's uncle from voir dire over Presley's express objection and his uncle's request for " 'some accommodation.' " *Presley*, 558 U.S. at 210 (internal quotation marks omitted). The Supreme Court concluded that excluding Presley's uncle from voir dire was a courtroom closure that violated Presley's Sixth Amendment[44] right to a public trial. *Presley*, 558 U.S. at 216.

¶55 The issue before the Supreme Court was whether Presley's Sixth Amendment right to a public trial extended to voir dire and whether a trial court must consider alternatives to a courtroom closure when a defendant proffers no alternatives for the court to consider. *Presley*, 558 U.S. at 211. The Supreme Court did not, however, issue a bright line rule about the appropriate *remedy* for *all* courtroom closures, as the majority here implies. Nor did *Presley* expressly or impliedly overrule the Court's previous holding in *Waller v. Georgia*, 467 U.S. 39, 50, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984), in which it had adopted an approach similar to that in *Momah* and had required a "remedy . . . appropriate to the violation" for courtroom closure cases. Therefore, under both *Presley* and *Momah*, a "remedy appropriate to the violation" for courtroom closure cases, not automatic reversal, is still the standard and all that is required under federal and state law.

¶56 Furthermore, the United States Supreme Court has frequently admonished both (1) that lower courts should not speculate or conclude that its "more recent cases have, *by implication, overruled an earlier precedent*" and (2) that we should follow the case that directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions. *Agostini v. Felton*, 521 U.S. 203, 237, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997) (emphasis added). Far from overruling the approach that our Washington Supreme

[44] U.S. Const. amend. VI.

Court took in *Momah*, *Presley* further supports the "remedy appropriate to the violation" standard, not automatic reversal. Accordingly, I respectfully disagree with the majority's conclusion that *Presley* "sub silentio"[45] overruled *Momah* or that its holding requires the remedy that the majority chooses here.

¶57 More importantly, as we recently held in *Bennett*, we should not reverse and remand for a new trial where, as here, the record does not clearly show a violation of Slert's rights. In my view, nothing in the record or the law warrants reversal and remand for a fourth trial 12 years after Slert's original conviction. I would affirm.

Review granted at 176 Wn.2d 1031 (2013).

---

[45] Majority at 776.